NATIONAL TEL. NEWS CO. et al. v. WESTERN UNION TEL. CO.

(Circuit Court of Appeals, Seventh Circuit: October 28, 1902.)

No. 789.

1. LITERARY PROPERTY—MATTER SUBJECT TO COPYRIGHT—TELEGRAPHIC QUOTATIONS.

The matter gathered and transmitted by a telegraph company, and printed on a tape by tickers in the offices of its customers, consisting merely of a notation of current events, such as market quotations or the result of a race or game, and having only a transient value, due solely to its quick transmission and distribution, is not copyrightable as literary property, under the constitution and statutes of the United States, but is essentially a commercial product.

2. UNFAIR COMPETITION—TELEGRAPH COMPANIES—COPYING OF MARKET QUOTATIONS.

The gathering of news and its transmission by telegraph is a legitimate business enterprise, carried on through the joint agency of capital and business ability, and as such is entitled to protection, in all its branches, from unfair competition, on the principle which governs courts of equity in granting relief against infringement of common-law trade-marks; and a company engaged in such business, which gathers at its own cost, and distributes to its customers by means of special wires and tickers, news in which they have a peculiar interest, and for which they pay, such as market quotations,—the value of the business to the company depending upon its ability, through the facilities it has created, by the expenditure of money, to furnish such news immediately after the occurrences noted,—cannot be said to have thereby published such news, in such sense as to entitle a competitor to copy the same from a customer's tape as fast as received, and distribute it to its own patrons.

Appeal from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

¶ 1. Matter subject to copyright, see note to Drill Co. v. Mullen, 27 C. C. A. 248.

¶ 2. Unfair competition, see notes to Scheuer v. Muller, 20 C. C. A. 165; Lare v. Harper & Bros., 30 C. C. A. 376.

The bill in the Circuit Court was by appellee, a corporation of New York, against the appellants, The National Telegraph News Company, a corporation of Illinois, and F. E. Crawford and A. K. Brown, citizens of Illinois; and the appeal is from an interlocutory order restraining the appellants, and each of them, their servants, agents and employés, from copying from the appellee's electrical instruments and printing machines, known as tickers, for the purpose of publishing, selling or transmitting through their own tickers, or otherwise disposing of, or using, any of the news or information—such as base-ball, foot-ball, racing, athletics, stock, grain and produce quotations, financial and other reports—which may thereafter be collected, formulated and transmitted by the appellee through its tickers; and from publishing, selling or using the matter so copied until the lapse of fully sixty minutes from the time such news items are printed by appellee's tickers.

The further facts appear in the opinion of the court.

Thomas S. Chadbourne and Charles S. Holt, for appellants.

H. D. Estabrook, for appellee.

Before JENKINS and GROSSCUP, Circuit Judges, and BUNN, District Judge.

GROSSCUP, Circuit Judge, delivered the opinion of the Court:

The appellee, the Western Union Telegraph Company, does a general telegraphing business, having offices in every state, village, hamlet and railroad station in the country, and wires connecting the same with central offices through the country.

About 1881 there was invented an instrument which, by means of a type wheel, actuated by electrical impulse, automatically prints in plain, ordinary type, upon a strip of paper, messages transmitted electrically from a distance. The instrument is now generally known as the "ticker," and is commonly found in the offices of brokers, bankers and other persons interested in the current price of securities, and in hotels, saloons and other places where people, who are interested in the happenings of the race tracks, athletic clubs, baseball associations, and in pending events generally, are in the habit of gathering. Upon the perfecting of this instrument appellee entered, in addition to its general telegraph business, upon a business heretofore new to it. It collected at various points, where it had offices, news relating to events there transpiring, and, after accumulating in its central offices such product by means of its wires, redistributed to its tickers, in the offices and places of its patrons, by means of local wires, what was deemed of sufficient interest. The news thus gathered and printed upon strips of paper is open to the inspection of all persons who may come within these places.

The appellants, The National Telegraph News Company, and F. E. Crawford and A. K. Brown, its officers, own and control within the city of Chicago, a system of wires, connecting their operating office with tickers of their own, in the offices and places of patrons of their own. The evidence in the record before us shows that they have been appropriating vi et armis the news appearing upon the appellee's tape; and thereupon, with the loss of a few moments only, redistributing such news over their own wires and tickers to their own patrons. Such appropriation is not denied; but is defended as appellants' lawful right, upon the ground, chiefly, that upon the appearance of the printed tape upon the appellee's tickers, in the places

of appellee's patrons, there is such a publication as, within the meaning of the law, dedicates the contents of the tape to the public, and deprives appellee of any further monopoly therein.

The contention is grounded, chiefly, upon the assumption that the matter thus printed is, unless the subject-matter of copyright, unprotected against appropriation by the public; and, if the subject-matter of copyright, comes under section 4956 of the Revised Statutes [U. S. Comp. St. 1901, p. 3407], which provides that no person shall be entitled to a copyright unless he shall, before publication, deliver at the office of the librarian of Congress, or deposit in the mail addressed to the librarian of Congress at Washington, a printed copy of the title of the book, or other article, or a description of the painting, drawing, chromo, statue, statuary, or a model or design for a work of the fine arts, for which he desires copyright.

It is obvious, at a single glance, that the appellee is at great expense in gathering and transmitting the news, and in maintaining the instrumentalities, the offices, and the wires, through which its work, in this respect, is accomplished. At every initial point there must be one who is on the look-out—eyes trained to see, and a judgment trained to discriminate—and in every central office there must be minds fitted by native wit and acquired knowledge to winnow the wheat from the chaff. Added to this is the increased cost of dispatchers, instruments, wires and plant made necessary by this special department of appellee's business.

It is obvious, also, that if appellants may lawfully appropriate the product thus expensively put upon the appellee's tape, and distribute the same instantaneously to their own patrons, as their own product, thus escaping any expense of collection, but one result could follow—the gathering and distributing of news, as a business enterprise, would cease altogether. Appellee could not, in the nature of things, procure copyright under the Act of Congress upon its printed tape; and it could not, against such unfair conditions, without some measure of protection, compete with appellants upon prices to be charged their respective patrons. And in the withdrawal of appellee. from this business, there would come death to the business of appellants as well; for without the use of appellee's tape, appellants would have nothing to distribute. The parasite that killed, would itself be killed, and the public would be left without any service at any price.

The general question raised by appellants' contention, then, is this: Is the printed tape, coming out of appellee's tickers, a book or article within the meaning of the copyright laws of the United States, and especially of section 4956 [U. S. Comp. St. 1901, p. 3407], and if not a book or article within the meaning of the copyright law, is there any remedy that will protect this feature of appellee's business against the kind of piracy shown?

We are of the opinion that the printed tape would not be copyrightable, even if the practical difficulties were out of the way. When the federal constitution was adopted the right of property in literary production had been already securely established in English law. Its source, whether in natural right, or in the statute of Anne, was

still in doubt; but that an author had ownership of some species over the production of his brain—an ownership as distinctive as that of the creator of corporeal property—was conceded by all. Indeed, it could not be otherwise in a civil polity that recognizes the individual, and his right to enjoy what he creates, as the unit of organized society.

But when the federal constitution was adopted, the application of this right to productions other than those strictly literary had not yet been mooted. The great case of Donaldson v. Beckett, 2 Brown, Parl. Cas. 129, had been decided only thirteen years previously. The business world, that in this day permits nothing to escape as a means for its exploitation had not yet pressed into her service art and books. Business catalogues, circulars containing market quotations, sheets, such as Dun's and Bradstreet's, directories—the whole staff of aides-de-camp to commerce, now familiar to all—were then practically unknown. In the public mind, the publication of a book meant that literature, as Literature, had received an accession.

Unquestionably, the framers of the constitution, in vesting Congress with "power to promote the progress of science and the useful arts, by securing for limited times to authors and inventors exclusive right to their respective writings and discoveries," had this kind of authorship in mind; and were the intention of the framers of the constitution to give boundary to the constitutional grant, many writings, to which copyright has since been extended, would have been excluded. But, here as elsewhere, the constitution, under judicial construction, has expanded to new conditions as they arose. Little by little copyright has been extended to the literature of commerce, so that it now includes books that the old guild of authors would have disdained; catalogues, mathematical tables, statistics, designs, guide-books, directories, and other works of similar character. Nothing, it would seem, evincing, in its makeup, that there has been underneath it, in some substantial way, the mind of a creator or originator, is now excluded. A belief that in no other way can the labor of the brain, in these useful departments of life, be adequately protected, is doubtless responsible for this wide departure from what was unquestionably the original purpose of the constitution.

But, obviously, there is a point at which this process of expansion must cease. It would be both inequitable and impracticable to give copyright to every printed article. Much of current publication—in fact the greater portion—is nothing beyond the mere notation of events transpiring, which, if transpiring at all, are accessible by all. It is inconceivable that the copyright grant of the constitution, and the statutes in pursuance thereof, were meant to give a monopoly of narrative to him, who, putting the bare recital of events in print, went through the routine formulæ of the copyright statutes.

It would be difficult to define, comprehensively, what character of writing is copyrightable, and what is not. But, for the purposes of this case, we may fix the confines at the point where authorship proper ends, and mere annals begin. Nor is this line easily drawn. Generally speaking, authorship implies that there has been put into the production something meritorious from the author's own mind;

that the product embodies the thought of the author, as well as the thought of others; and would not have found existence in the form presented, but for the distinctive individuality of mind from which it sprang. A mere annal, on the contrary, is the reduction to copy of an event that others, in a like situation, would have observed; and its statement in the substantial form that people generally would have adopted. A catalogue, or a table of statistics, or business publications generally, may thus belong to either one or the other of these classes. If, in their makeup, there is evinced some peculiar mental endowment—the grasp of mind, say in a table of statistics, that can gather in all that is needful, the discrimination that adjusts their proportions—there may be authorship within the meaning of the copyright grant as interpreted by the courts. But if, on the contrary, such writings are a mere notation of the figures at which stocks or cereals have sold, or of the result of a horse race, or base-ball game, they cannot be said to bear the impress of individuality, and fail, therefore, to rise to the plane of authorship. In authorship, the product has some likeness to the mind underneath it; in a work of mere notation, the mind is guide only to the fingers that make the notation. One is the product of originality; the other the product of opportunity.

Judged by a test like this, the printed matter on the tape in question is in no sense copyrightable. It is, at most, the mere annal of events transpiring. True, the happenings of a race track, or the incidents of a college boat race, may be put in narrative, involving creative imagination; or the doings of a board of trade become the basis of a useful book or article evincing originality. But the printed tape under consideration is no such book or article, and affects no such dignity. It is, in its totality, nothing more or less than the transmission by electricity, over long distances, of what a spectator of the event, occupying a fortunate position to see or hear, would have communicated, by word of mouth, to his less fortunate neighbor. It is an exchange merely, over wider area, of ordinary sightseeing; and the exchange is in the language of the ordinary sightseer. Matter of this character is not, within the meaning of the copyright law, the fruit of intellectual labor, and would not, if actually copyrighted, be protected by the courts. Iron Works v. Clow, 27 C. C. A. 250, 82 Fed. 316.

Indeed, the printed tape under consideration has no value at all as a book or article. It lasts literally for an hour, and is in the waste basket when the hour has passed. It is not desired by the patron for the intrinsic value of the happening recorded—the happening, as an happening, may have no value. The value of the tape to the patron is almost wholly in the fact that the knowledge thus communicated is earlier, in point of time, than knowledge communicated through other means, or to persons other than those having a like service. In just this quality—to coin a word, the precommunicatedness of the information—is the essence of appellee's service; the quality that wins from the patron his patronage.

Now, in virtue of this quality, and of this quality alone, the printed tape has acquired a commercial value. It is, when thus looked at,

a distinct commercial product, as much so as any other out-put relating to business, and brought about by the joint agency of capital and business ability.   In no accurate view can appellee be said to be a publisher or author.   Its place, in the classification of the law, is that of a carrier of news; the contents of the tape being an implement only, in the hands of such carrier, in its engagement for quick transmission.   This is Service; not Authorship, nor the work of the Publisher.

This, then, brings us to the second inquiry:   Is there any remedy that will protect appellee, in this feature of its business, against the piracy of outsiders?   Has appellee, in the performance of this service, no appeal to the law?

It will be noted, first, that the business is, as an entirety, a lawful one.   It meets a distinctive commercial want, and in some of its branches, at least, adds to the facilities of the business world.   Indeed, no argument against its lawfulness has been advanced.

The business involves, also, the use of property.   This consideration brings it at once, in a general way, within the protecting care of courts of equity.   At first glance the immediate act restrained in the order below—the use of the information by a rival enterprise until after sixty minutes—may not appear as a trespass upon, or injury to, property, other than to the extent that there may be property in the printed matter.   But such a view falls short of looking far enough.   Property, even as distinguished from property in intellectual production, is not, in its modern sense, confined to that which may be touched by the hand, or seen by the eye.   What is called tangible property has come to be, in most great enterprises, but the embodiment, physically, of an underlying life—a life that, in its contribution to success, is immeasurably more effective than the mere physical embodiment.   Such, for example, are properties built upon franchises, on grants of government, on good will, or on trade names, and the like.   It is needless to say, that to every ingredient of property thus made up—the intangible as well as the tangible, that which is discernible to mind only, as well as that susceptible to physical touch—equity extends appropriate protection.   Otherwise courts of equity would be unequal to their supposed great purposes; and every day, as business life grows more complicated, such inadequacy would be increasingly felt.

Nowhere is this recognition by courts of equity of the intangible side of property better exemplified, than in the remedies recently developed against unfair competition in trade.   An unregistered trade name or mark is, in essence, nothing more than a symbol, conveying to eye and ear information respecting origin and identity; as if the manufacturer, present in person, and pointing to the article, were to say, "These are mine"; and the injunctive remedy applied is simply a command that this form of speech—this method of saying, These are mine—shall not be intruded upon unfairly by a like speech of another.

Standing apart, the symbol or speech is not property.   Disconnected from the business in which it is utilized it cannot be monopolized.   But used as a method of making an enterprise succeed, so

that its appropriation by another would be a distinctive injury to the enterprise to which it is attached, the name, or mark, becomes at once the subject-matter of equitable protection. Here, as elsewhere, the eye of equity jurisdiction seeks out results, and though the immediate thing to be acted upon by the injunction is not itself, alone considered, property, it is enough that the act complained of will result, even though somewhat remotely, in injury to property.

Considering that in such case, equity, without question, lays its restraining hands upon the injurious appropriation of words that belong to the common language of mankind—than which nothing could be freer to the uses of men—there ought, it would seem, to be no difficulty, in the case under consideration, to find the power so manifestly needful.

The case under consideration may be summed up as follows: The business of appellee is that of a carrier of information. The gist of its service to the patron is, that, by such carriage, the patron acquires knowledge of the matter communicated earlier than those not thus served. The ticker, with its printed tape, is an implement or means only to this commercial end, which the patron, or the patron's patron, may utilize to the end intended, but may not appropriate to some end not intended, especially if such appropriation result in injury to, or total destruction of, the service. In short, the law being clearly inadequate to that purpose, equity should see to it, that the one who is served, and the one who serves, each gets what the engagement between them calls for; and that neither, to the injury of the other, shall appropriate more.

The immediate business of appellee brought to our attention, in the case under review, may not arouse any great solicitude. It relates to the gathering and distributing of news, not looked upon perhaps, in all quarters, as essential to the public welfare. But the questions raised are of much wider significance. They involve, among others, that modern enterprise—one of the distinctive achievements of our day—which, combining the genius and the accumulations of men, with the forces of electricity, combs the earth's surface, each day, for what the day has brought forth, that whatever befalls the sons of men shall come, almost instantaneously, into the consciousness of mankind. Thus, a gun thunders in a harbor on the other side of the earth; before its reverberations have ceased, the moral sequence of the event has taken root in every civilized quarter of the earth. Famine arises in India to begin its grim march; it has gotten but little under way until a counter army—the unfailing benevolence of human kind—has been mustered from America to Russia. On an isolated island, and without premonition, a mountain claps its black hands upon the population of a city; almost before a ship in the harbor, with tidings of the catastrophe, could have set sail, relief ships from the harbors of Christendom are under way. By such agencies as these the world is made to face itself unceasingly in the glass, and is put to those tests that bring increasing helpfulness and beauty into the heart of our race.

Is service like this to be outlawed? Is the enterprise of the great news agencies, or the independent enterprise of the great newspa-

pers, or of the great telegraph and cable lines, to be denied appeal to the courts, against the inroads of the parasite, for no other reason than that the law, fashioned hitherto to fit the relations of authors and the public, cannot be made to fit the relations of the public and this dissimilar class of servants? Are we to fail our plain duty for mere lack of precedent? We choose, rather, to make precedent— one from which is eliminated, as immaterial, the law grown up around authorship—and we see no better way to start this precedent upon a career, than by affirming the order appealed from.

Affirmed.

Note. BAKER, Circuit Judge, though not sitting in this case, read, in connection with the following case, Illinois Commission Co. v. Cleveland Tel. Co., infra, the briefs and record herein, and took part, informally, in the conferences. He authorizes the statement that the reasoning and conclusions arrived at in this case, meet with his concurrence.