ASSOCIATED PRESS v. INTERNATIONAL NEWS SERVICE.

(District Court, S. D. New York.  March 29, 1917.)

No. 263.

1. LITERARY PROPERTY ⬯9—PIRACY—EVIDENCE.

In a suit between rival news agencies, where complainant moved for a preliminary injunction to restrain defendant from appropriating news gathered by it, affidavits and moving papers *held* to warrant finding that defendant arranged with employés of newspapers served by complainant to deliver such news to defendant for a consideration before publication.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 8.]

2. LITERARY PROPERTY ⬯9—PIRACY—EVIDENCE.

In a suit between rival news agencies, where complainant sought a preliminary injunction to restrain defendant from appropriating news gathered by it, evidence *held* to warrant a finding that defendant induced a newspaper served by complainant to permit defendant to obtain news furnished by complainant before publication, by allowing defendant's employés to read such news sheets in the editorial room of a newspaper.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 8.]

3. LITERARY PROPERTY ⬯8—PIRACY—WHAT CONSTITUTES.

Where complainant newsgathering agency furnished news to so-called members, who were under an obligation to use it only for their own publications, complainant is entitled to be protected against defendant's method of procuring such news before publication by hiring employés of the members to give information as to news, or securing information directly from news sheets furnished members;' such acts constituting a tortious invasion of complainant's rights.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 7.]

4. PRINCIPAL AND AGENT ⬯116(1)—LIABILITY OF PRINCIPAL FOR ACTS OF AGENT.

A principal is liable for the acts of agents within the general scope of their employment, even though contrary to its directions.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. § 377.]

5. EQUITY ⬯65(2)—INJUNCTION—CLEAN HANDS.

Complainant conducted a news service agency, serving members who were under obligation to use such news only in their own publications. Defendant, a rival newsgathering agency, hired employés of members to inform it of news gathered by complainant before publication, and in some cases secured news direct from members.  Occasionally complainant received tips as to stories from an employé of a member, who was in the pay of the defendant. *Held* that, though complainant sporadically obtained news from defendant contrary to the directions of its officers and managers, complainant cannot be denied relief, on the ground that he who comes into equity must do so with clean hands, for such doctrine cannot be based on technical theories of agency.

[Ed. Note.—For other cases, see Equity, Cent. Dig. § 186.]

6. LITERARY PROPERTY ⬯9—PROTECTION—PIRACY.

Complainant news service company served various newspapers, which were its members.  Defendant took news published in early editions by members and disseminated it to its own customers, although in some instances verifying the stories.  *Held* that, in view of the analogy of common-law copyrights and stock and grain quotations, complainant was for a reasonable time entitled to protection from the piracy of its news, and defendant could not take news from such early editions.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 8.]

⬯For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

7. LITERARY PROPERTY ☞5—NEWS—PUBLIC POLICY.
   In such case, as complainant might withhold news gathered, defendant cannot justify its piracy on the ground that public policy required the dissemination of news.
   [Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 4.]

8. LITERARY PROPERTY ☞9—RIGHT TO PROTECTION—INJUNCTION.
   Where complainant gathered news, which was disseminated to members, who were entitled to use it only in their own publications, a preliminary injunction will be issued to prevent defendant from obtaining such news by hiring employés of members to furnish it with such news before publication, where such piracy was systematic, and defendant claimed to be entitled to continue, though it also claimed that its managing officers did not know of the practice.
   [Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 8.]

9. LITERARY PROPERTY ☞9—PRELIMINARY INJUNCTION—RIGHT TO.
   Complainant news service company gathered news, which was disseminated to newspapers that were members of complainant. Defendant pirated such news, by taking it from early editions issued by complainant's members, and then disposing of it to others. *Held* that, while complainant was entitled to protection, nevertheless, as the matter was one of first impression, and not free from doubt, a preliminary injunction will not be granted.
   [Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 8.]

In Equity. Bill by the Associated Press against the International News Service. Decree for complainant.

Stetson, Jennings & Russell, of New York City (Frederic B. Jennings and Winfred T. Denison, both of New York City, of counsel), for complainant.

William A. De Ford, of New York City (Samuel Untermyer, Henry A. Wise, Irwin Untermyer, William A. De Ford, Claude A. Thompson, and John T. Sturdevant, all of New York City, of counsel), for defendant.

AUGUSTUS N. HAND, District Judge. This is a motion for an injunction pendente lite to restrain the defendant from appropriating the news gathered by the complainant. Each party to the suit is engaged in the business of procuring news and supplying it to newspapers. The complainant is a membership corporation, and the defendant a stock corporation. The complainant during the year 1915 expended about $3,500,000 in gathering news from all parts of the world for its members, which was assessed among them under the provisions of its by-laws, and the defendant expended more than $2,000,000 during the same year in supplying news to its customers. It thus appears that the gathering and distributing of news requires a very large expenditure of labor and capital, and it is hardly necessary to say that no modern daily newspaper can afford to be without the facilities offered by a well-equipped news agency.

The by-laws of the Associated Press provide that each member shall be entitled to receive a service of news for the purpose of publication in the newspaper specified in his certificate of membership, and for that purpose only, and that a member shall publish the news of the Associated Press only in the newspaper, language, and place speci-

fied in his certificate of membership, and shall not permit any other use to be made of the news furnished by the corporation to him or to the newspaper which he represents, and that no member shall furnish, or permit any one in his employ or connected with the newspaper specified in his certificate of membership to furnish, to any person who is not a member, news of the Associated Press in advance of publication. Each of the members is likewise required by the by-laws to gather and supply the local news of his district to the Associated Press, and to no one else (affidavit of W. P. Leech, verified January 19th, filed on behalf of complainant).

Much the same arrangement as above outlined exists between the International News Service and the newspapers receiving its service. A considerable number of newspapers make use of the news furnished by both of these agencies. The value of the news accumulated by each of the parties to this suit depends upon its accuracy and upon its reaching the newspapers served before the news of any other competing news agency can be furnished. The bill of complaint states that:

"An essential part of the plan of operation of the complainant accordingly is that news collected by it shall remain confidential and secret until its publication has been fully accomplished by all of complainant's members, because otherwise competing newspapers, which bear no part of the cost, would unfairly and inequitably receive the benefit of the service, and such a result would ultimately greatly impair the usefulness of the Association to its members and imperil its very existence."

There is, to be sure, no requirement of the by-laws of the Associated Press that its members must publish news furnished by it at the same hour, and they necessarily do issue their publications at various times. Western papers, owing to the difference in time, can be furnished by a competing news agency with the news of the Associated Press published in the newspapers of its Eastern members, and gathered by it at great cost, with no expense of collection to the rival agency, unless the *sale* of the news can be withheld for a sufficient time to prevent this. It is therefore undoubtedly a part of the successful operation of a country-wide news agency that rivals shall not be able to sell the news which its customers have published in the East to newspapers published several hours later in the West. In no other way can the results of its labor and enterprise receive any real protection within much of the territory it undertakes to serve. I comment upon this noticeable fact in passing, without at this time discussing the legal features.

The complainant alleges that the defendant has wronged it, and should be enjoined as to three matters: (1) Arranging with employés of members of the Associated Press to furnish its news to the defendant for a consideration before publication; (2) inducing members to violate complainant's by-laws and permit defendant to obtain news of the Associated Press before publication; (3) copying news on bulletin boards and in early editions of complainant's members and selling this news to defendant's customers.

[1] I will take up the foregoing charges seriatim. The moving papers establish beyond a peradventure that the defendant employed

at $5 per week a B. E. Cushing, the telegraph editor of the Cleveland News, a paper holding a certificate of membership from the Associated Press, to furnish the defendant with local news gathered by the Cleveland paper. Indeed, the defendant not only admits that such is the fact, but insists that such was the nature of the employment of Cushing and his only authorized service for defendant. Cushing not only furnished the defendant with local news of the Cleveland district, but also a substantial amount of other and particularly of foreign news, which had come to the Cleveland paper over the wires of the Associated Press. The sinking of the hospital ship Britannic in the Ægean Sea, the decision by the United States District Court in Kansas that the Adamson law was unconstitutional, the fire on the steamer Powhatan off Block Island, the German raid on the east coast of England on November 28, 1916, the sinking of the steamer Chemung in the Mediterranean, the declination of A. Bonar Law of the premiership and preliminaries to the appointment of Lloyd George, the explosion in the Quaker Oats plant in Canada, the fire in Toledo, Ohio, the illness of Lloyd George, the statements of Premier Briand as to the attitude of the Allies regarding German peace proposals, and the explosion and loss of life in mines of the Tennessee Coal & Iron Company were all matters in respect to which some communications were made to the defendant by Cushing of news received from the Associated Press.

Barry Faris, the day manager of the defendant, on November 21, 1916, wrote F. H. Ward, the manager of the Cleveland office of the defendant, a letter of which the material portion is the following:

"Dear Mr. Ward: Agnew had an arrangement somewhere in the Cleveland office whereby he could tip us off on big news stories that the A. P. was carrying. I wish you would find out from him just what this connection was, and if you cannot make use of it. It proves very valuable to receive a tip what the A. P. is carrying as soon as it puts it out on the wire. Don't mention the A. P. in any messages of that kind, but simply say, 'Ansonia carrying fifty dead Pennsylvania wreck Pittsburg,' or whatever it may be. * * *

"Barry Faris."

The foregoing letter from a responsible man in the employ of the defendant indicates a systematic attempt to secure news of the complainant and is the strongest corroboration of the latter's charges. It is not necessary to suppose that such a system was known to the officers of the defendant, or the proprietor of the Cleveland News, who deny that knowledge; but it is sufficient that the system existed and the acts were frequent and continuous. The only qualification of the facts I have recited, which the defendant makes, is the statement of Cushing, in his affidavit submitted by defendant, that he seldom volunteered tips of the Associated Press to the defendant, and that there were only two cases that he can definitely remember where such information originated with him. It can hardly be thought that Faris, in his letter to Ward, referred to local Cleveland news when he spoke of "big stories that the A. P. was carrying." The only difference between local and foreign news is that the latter was more valuable to the defendant, and the divulging of it more serious to the complainant, especially since the Allies have deprived the defendant of the right

to use their cables, and thus get news readily in the countries of Europe. It was equally illegal for the defendant to secure local news from the Cleveland newspaper, since that involved a violation by the latter of its express contract with the complainant not to divulge this news to any one but the Associated Press, except so far as it published it in its own papers.

Agnew was the manager of the defendant in Cleveland, and makes oath to certain communications to the defendant in reference to the foregoing news of the Associated Press. Cushing himself deposes to his employment by the defendant, without the knowledge of either the Cleveland News or the Associated Press of his relationship with the defendant. He also swears that he communicated to the defendant both foreign and domestic news belonging to the Associated Press. There cannot be the slightest doubt that complainant's news was pirated at Cleveland, and it is not really questioned. Cushing says, in his affidavit read on behalf of the defendant, that "he seldom volunteered tips to the manager of the Cleveland office of the International News"; but this is a weak qualification of the opposing affidavits, two of which he makes himself. He admits he was approached by the manager of the defendant's Chicago office and was employed to give it news. The intimate relation of the New York office of the defendant to this abstraction of complainant's news is evident from the following dispatches to the International News at Cleveland from Barry Faris:

"D. R. Anything on Chemung sunk? B. F. 2:45 p. m."
. "D. R. Has Lloyd George resigned war secretaryship? B. F. N. Y. December 5, 12:27 p. m."
"D. R. What Ansonia now say Lloyd George? B. F. 1:10 p. m. Dec. 5."

More than that, Ward, the Cleveland manager of the office of the International News, says in his affidavit (folios 140, 141):

"The first time that I learned that B. E. Cushing was an employé of the International News Service was when I substituted for Agnew during Agnew's vacation in the summer of 1916. I then learned for the first time that Cushing was employed to notify the Cleveland bureau of the International News Service of any local news, promptly, which originated in Cleveland or vicinity, and which came to him or to the Cleveland News, and which the Cleveland News would naturally carry. I also learned at this time from Agnew that Mr. Cushing occasionally called him on the telephone and told him that the Associated Press was carrying such and such a story. While I was so substituting for Agnew, during the summer, the said Cushing called me on the telephone several times and tipped me off to certain stories which had come into the offices of the Cleveland News, through the Associated Press. He also, of course, gave me a number of items of news originating in Cleveland and vicinity. At that time, so far as I can remember, I did not send over the wire to the International News Service any information given me by Cushing relative to Associated Press stories. After I became manager of the Cleveland bureau of the International News Service, when I was tipped off that the A. P. was carrying a certain story, I would at once message New York, with the idea of getting an International News Service story for the Cleveland News, and for my Ohio state wire, so that. I could legitimately serve our own subscribers with the same story that the A. P. had. Cushing never read me the A. P. story or bulletin, so far as I know; all he ever gave me was a tip as to the nature, character, and source of the story. It was up to us to get our information, then, as best we could."

This is certainly not a convincing defense. by the Cleveland manager of a corporation charged with securing news improperly, and the foregoing affidavit of Ward, when taken with the letter and telegrams of Faris I have mentioned, establishes that the first charge of the complaint is sustained by the moving papers.

[2] The second charge against the defendant is the claim that defendant's employés read the news sheets of the Associated Press in the editorial room of the New York American. The New York American was and is a member of the Associated Press, and had a Morkrum receiving machine in its editorial room on which the news appeared. James Finnerty, who attended to the Morkrum machine, has made an affidavit, verified January 3, 1917, in which he states that Coates, an employé of the International News Service, the office of which was in the same building as that of the New York American, nightly examined the sheets containing the news received from the Associated Press and made copies or extracts. E. P. Koukol, who attended to the Morkrum machine one night a week, and Ronald S. Wishart, a Morkrum inspector, made a similar affidavit as to Frank B. Atwood, one of the editors of the International News Service, and deposed that he constantly came to the office of the New York American and examined Associated Press news sheets, and at times took notes from them. That such was the practice of defendant's employés is further corroborated by the affidavit of George H. Eke, who was accustomed to go to the office of the New York American to inspect the Morkrum machine.

These charges are strenuously controverted in the affidavits filed by the defendant. It is to be noticed, however, that no affidavit appears either from Coates or Atwood, who are the persons said to have secured the complainant's news. This is very significant, and in view of such an omission the positive affidavits that such things occurred should prevail over defendant's affidavits from persons who simply swear, however positively, or even truthfully, that they never witnessed such practices.

[3] It is well settled that the defendant had no right to obtain news from the members of the Associated Press, who were under an obligation only to use it for their own publications, by employing their clerks to give the information, as was done in the case of Cushing of the Cleveland News, or by securing the information directly, as was done through looking over the news sheets of the complainant in the office of the New York American. The news was gathered by the Associated Press at great cost, and was entitled to be protected from abstraction in any such ways. Board of Trade v. Christie Grain & Stock Co., 198 U. S. 236, 25 Sup. Ct. 637, 49 L. Ed. 1031; Exchange Telegraph Co. v. Gregory, [1896] 1 Q. B. D. 147; Exchange Telegraph Co. v. Central News, Ltd., [1897] 2 Ch. Div. 48; Dodge v. Construction Information Co:, 183 Mass. 62, 66 N. E. 204, 60 L. R. A. 810, 97 Am. St. Rep. 412.

[4] The foregoing acts, whether or not done contrary to the directions of defendant's officers, were done by persons acting for it within the general scope of their employment, and the liability must rest upon the principal.

[5] The strongest objection urged by the defendant to the granting of any injunction is based upon the charge that complainant has been guilty of continuous abstraction of defendant's news, and therefore should be debarred from seeking the aid of a court of equity. I think the complainant has established that such practices, if they have existed, were contrary to the rules of the Associated Press and the careful direction of its officers and manager, and were limited to but a few sporadic instances at most. Now the doctrine that he who comes into equity must come in with clean hands does not recognize mere imputations of guilt based upon technical theories of agency. To invoke it a knowledge must exist on the part of the principal of the facts upon which the charge of unconscionable conduct is based, and in the case of a corporation those facts must be brought home to the persons exercising general control over its affairs.

No such knowledge has been shown on the part of the officers or manager of the Associated Press, and the complainant consequently is not barred from seeking relief against the matters referred to in (1) and (2) supra, by reason of anything complainant itself has done. On the other hand, complainant's counsel are entirely right in their contention that the liability of the defendant for the acts of its agents exists entirely irrespective of knowledge of its officers, and an injunction may issue to prevent the continuance. The legal questions involved in this conclusion are discussed by the New Jersey Court of Errors and Appeals in a clear and convincing opinion in the case of Vulcan Detinning Company v. American Can Co., 72 N. J. Eq. 387, 67 Atl. 339, 12 L. R. A. (N. S.) 102, and I fully concur in the reasoning of that court.

The briefs contain so much discussion as to the practices of the complainant in obtaining news that I should perhaps refer briefly to the evidence on this point. Various employés of the Cleveland News have furnished affidavits to defendant that Cushing gave tips to the Associated Press of news he had received from defendant before it had ever been published. The subject-matter of such tips, with two exceptions, which I shall mention, is not related, and the text of the affidavits seems to indicate that Cushing was seeking information for the Cleveland News, rather than imparting to the Associated Press any information he had received from the defendant. Smiley, in his affidavit, says, for example, that Cushing, "when some story of great importance was carried on the wires of the International News Service, and which had not yet appeared in the copy sent to the telegraph desk of the Associated Press, and in a way which might be construed as a tip, inquired if they knew anything about said story." Field, in his affidavit, says Cushing would call up the Associated Press and "say, for example: 'Hearst has a bulletin on a wreck down state. Can you find anything about it for me?'" Anson makes affidavit that Cushing would say, "for example: 'Hearst is carrying such and such a story out of such and such a place. What have you got on it?'" Shimansky likewise deposes that Cushing would say, "for example: 'Hearst says hundred drowned on steamer Eastland, turned over in Chicago river. What have you?'"

It is manifest that these affidavits are intended to illustrate Cushing's

practice, rather than to relate any particular incident. Indeed, it is not clear that the news Cushing was telephoning about was not Cleveland local news. Moreover, McGuire, who was correspondent of the Associated Press in Cleveland, deposes that all the news supplied by Cushing came to him; that the latter only gave him Cleveland local news, and never any items which to his knowledge originated in the dispatches of the International News Service. The only item of news specifically referred to in defendant's affidavits as having been furnished by Cushing to the Associated Press is that Pope Pius was still alive, when the Cleveland News, on information derived from the Associated Press, had published an extra that he was dead. In answer to this charge is the positive affidavit of Frederick Roy Martin, the assistant general manager of the Associated Press, that the latter never reported that the Pope was dead on the occasion in question, and that it reported him dead the following night, and only after his death occurred.

Cushing admits that he notified both complainant and defendant of the conflict in their stories as to the decision of the Adamson case, which resulted in the defendant's securing the correct news (which it did not theretofore have) that the District Court had held the act unconstitutional. It is clear that Cushing was secretly employed by defendant to furnish at least local news to it, though such news belonged to complainant, while his employment by the complainant to furnish local news was on the recommendation of the Cleveland News, and was known to every one in that office. Even if the officers of the defendant were innocent, it is also clear that Faris and Agnew sought and obtained from Cushing news that was other than local.

The cases where Cushing gave any news of the defendant to the Associated Press were, I think, so sporadic and occasional as to be almost inevitable in a person in his position. He swears that he never made a practice of giving such information to the Associated Press, and I believe he gave it, if at all, when he was endeavoring to verify items of news he had received as between the two agencies. An occasional lapse of this kind, if it occurred, is very different from the systematic disclosure by Cushing to the defendant of the news that the Associated Press carried. The secrecy of his employment by the defendant, I think, indicates the purpose of Agnew, who was defendant's representative at Cleveland at the time.

The defendant further charges the complainant with getting tips of the Lusitania disaster and the Solvay explosion that came over the wires of the International News Service at Syracuse during the Barnes-Roosevelt trial. Complainant's affiant, Kloeber, swears that their news about the Lusitania came from the service of the Dow-Jones Company, and in regard to the Solvay explosion that their representative at Syracuse telegraphed, "Can I do anything on explosion?" and complainant answered, "No, thanks; regular man should get the night story."

[6] The complainant, last of all, charges the defendant with taking news from early editions of newspapers which are members of the Associated Press and selling it to defendant's customers in the same text or in a paraphrase of its own. In reply to this charge the defendant has submitted affidavits that in Washington, Chicago, Atlanta, and else-

where the representatives of the Associated Press have taken news from early editions of defendant's subscribers and thereafter sold this news which defendant had secured. These affidavits contain general allegations rather than specific instances, and the allegations are denied by the complainant. In any event, this practice of obtaining news originally derived from a competing news agency, but after publication, is quite different from that of securing the news of a rival agency surreptitiously before publication. Both defendant and complainant confessedly secure news or "tips," so called, from first editions of newspapers supplied by their competitors, and both insist that they do not transmit any such news until an independent investigation is made and the news is verified. The methods employed by the Associated Press are set forth in its brief as follows:

"At this point there should be noted a clear and vital distinction between two kinds of use to which news taken from newspapers is put. The one use is for the purpose of obtaining the mere information or rumor that such and such an event has happened. Upon receipt of this information or rumor, the news distributing service then proceeds to obtain the news by its own independent investigation from the original sources at its own expense, and the only story sent out is based solely upon the strength of such investigation. This has been a recognized practice among all news agencies and has existed by common consent. The other use is to send out a story based in whole or in part upon the news obtained from the newspaper without independent investigation. This use may include the sending of the bare statement of the fact of the event, or a more extended copy of the details of the story of the rival news agency. This practice has never been recognized as fair or proper, and has never been adopted or allowed by the complainant. * * * This 'tip,' when received by The Associated Press, is used, not textually, nor in any modified form as a dispatch to the papers within its fold, for publication by them, but as a suggestion for investigation. An inquiry is set on foot, and an independent news report may be developed and used."

It is evident from the foregoing statement, as well as from the proofs as a whole, that both sides think news, *when published* by any subscribers to a competing news agency, may properly be investigated, and, if verified, the result of the verification may be sold. It is to be noted, however, that the original news is ex hypothesi the product of the labor and capital of him who gathers it, and whether it be treated as a mere "tip" for further investigation, or as an authentic and final report, it cannot be used by a rival news agency without depriving the gatherer of the very thing which is of value to him, namely, the power to control the sale of the news he has gathered until sufficient time has elapsed to enable it to be published by all the newspapers he supplies. Moreover, there is something rather grotesque in going through the form of verifying a tip, no matter how authentic it may be. In many cases the verification with modern telephonic communication would be so rapid that the time required for it would in no sense protect the original gatherer of the news. I cannot but feel that this matter of independent investigation is rather a question of business policy, for the news service that receives the tip, than of substantive law or fair dealing. In other words, the real matter for consideration is whether news gathered and sold to a newspaper, which publishes it, can be used after publication by a competing news agency, either as a tip for further investigation or as authentic news for immediate dis-

tribution before sufficient time has elapsed for the news to be publish-ed within the territory in which the gatherer is engaged in the general dissemination of news.

This question is most novel and important. I have said in the earlier part of this opinion that a news service is subjected to serious loss if its news is not protected from sale by a competing service until suffi-cient time has elapsed for publication by substantially all of its cus-tomers. This result might be secured if the news gatherer provided in its contracts that no publication of its news should be made by any of its subscribers until a given number of hours after receipt of the news. Such a plan would obviously be wholly impracticable, and, while giv-ing theoretical protection, would result in holding back the publication of the news sold for many hours. I think, therefore, that the only way to afford full protection to the newsgatherer is to prevent the use of news by a rival, either in the form of tips or otherwise, for a suffi-cient time to enable the daily newspapers throughout the country to receive and publish the news. There is no real publication, or purpose to abandon to the public, until that time. There have been various cases where the courts have protected those who have produced scenarios, plays, lectures, and pictures after publication; and at common law the right remained after publication, unless a purpose to dedicate to the public was plain. Ferris v. Frohman, 223 U. S. 424, 32 Sup. Ct. 263, 56 L. Ed. 492; Universal Film v. Copperman, 218 Fed. 577, 134 C. C. A. 305; Tompkins v. Halleck, 133 Mass. 32, 43 Am. Rep. 480; Caird v. Sime, L. R. 12 App. Cas. 326; Werckmeister v. American Litho-graphic Co., 134 Fed. 321, 69 C. C. A. 553, 68 L. R. A. 591.

Perhaps the closest analogy to the present situation is to be found in the stock and grain quotation cases, where it has been uniformly held that a rival quotation agency cannot secure the news in a broker's office, or upon an exchange, and sell it, even though these places may be open to all who desire to come in, and the news, except for this limitation, has become public property. Board of Trade v. Christie Grain & Stock Co., 198 U. S. 250, 25 Sup. Ct. 637, 49 L. Ed. 1031; National Telegraph News Co. v. Western Union, 119 Fed. 294, 56 C. C. A. 198, 60 L. R. A. 805; Board of Trade v. Tucker, 221 Fed. 305, 137 C. C. A. 255; Board of Trade v. Kinsey Co., 130 Fed. 507, 64 C. C. A. 669, 69 L. R. A. 59; Board of Trade v. Cella Commission Co., 145 Fed. 28, 76 C. C. A. 28. See, also, Kiernan v. Manhattan Quotation Tele-graph Co., 50 How. Prac. (N. Y.) 194.

The protection of lectures, plays, and paintings from piracy, even after wide publicity, is sometimes placed by the courts upon rights of authors to literary or artistic property, and sometimes upon the theory of an implied contract arising from the relations of the parties. In the stock and grain quotation decisions the right has been likened to a trade secret. Board of Trade v. Christie, supra. But in all these cases there is little basis for anything like secrecy, and there is often no real contract not to disclose what is published. Indeed, the per-son who hears or sees whatever may be the product of another's labor is entitled to the fullest use and enjoyment short of competitive com-mercial employment, just as the public is entitled to all the news that

appears in a newspaper, whatever may be its origin. The question in any given case is whether abandonment to the public has been so complete that no further justifiable cause remains for protecting these business interests from competitive interference. They do stand like trade secrets, in that they are entitled to protection until surrendered to the public; but the real basis for invoking equitable aid either in the case of a lecture, a play, or a trade secret is that one who has, with labor and expense, created something which, while intangible, is yet of value, is entitled to such protection against damage as is not inconsistent with public policy.

The case of Tribune Co. of Chicago v. Associated Press (C. C.) 116 Fed. 126, is confidently relied upon by the defendant. That was a decision by Judge Seaman to the effect that news of the South African War, published in the London Times and sent by cable to the Chicago Tribune, could not be copyrighted, and that a suit by the Tribune against the Associated Press to restrain infringement of copyright would not lie. The case was based solely upon doctrines of copyright law, the matter now under discussion was not referred to, and the decision was rendered by a single judge prior to that of the Circuit Court of Appeals of the Seventh Circuit, in the case of National Telegraph News Co. v. Western Union, 119 Fed. 294, 56 C. C. A. 198, 60 L. R. A. 805.

A most useful discussion of the legal questions here involved is found in the opinion of Judge Grosscup, writing for the Court of Appeals of the Seventh Circuit, in the case of National Telegraph News Co. v. Western Union, supra. That court held that stock quotations received on a ticker in a broker's office, while not subject to copyright and in general available to any one who cared to examine them, would be protected from sale for one hour after receipt. Judge Grosscup said:

" * * * The business is, as an entirety, a lawful one. It meets a distinctive commercial want, and in some of its branches, at least, adds to the facilities of the business world. * * * The business involves, also, the use of property. This consideration brings it at once, in a general way, within the protecting care of courts of equity. At first glance the immediate act restrained in the order below—the use of the information by a rival enterprise until after 60 minutes—may not appear as a trespass upon, or injury to, property, other than to the extent that there may be property in the printed matter. But such a view falls short of looking far enough. Property, even as distinguished from property in intellectual production, is not, in its modern sense, confined to that which may be touched by the hand, or seen by the eye. What is called tangible property has come to be, in most great enterprises, but the embodiment, physically, of an underlying life—a life that, in its contribution to success, is immeasurably more effective than the mere physical embodiment. Such for example, are properties built upon franchises, on grants of government, on good will or on trade-names, and the like. It is needless to say that to every ingredient of property thus made up —the intangible as well as the tangible, that which is discernible to mind only as well as that susceptible to physical touch—equity extends appropriate protection. Otherwise courts of equity would be unequal to their supposed great purposes; and every day, as business life grows more complicated, such inadequacy would be increasingly felt.

"Nowhere is this recognition by courts of equity of the intangible side of property better exemplified than in the remedies recently developed against unfair competition in trade. An unregistered trade name or mark is, in

essence, nothing more than a symbol, conveying to eye and ear information respecting origin and identity, as if the manufacturer, present in person, and pointing to the article were to say, 'These are mine;' and the injunctive remedy applied is simply a command that this form of speech—this method of saying, 'These are mine'—shall not be intruded upon unfairly by a like speech of another. Standing apart, the symbol or speech is not property. Disconnected from the business in which it is utilized, it cannot be monopolized. But used as a method of making an enterprise succeed, so that its appropriation by another would be a distinctive injury to the enterprise to which it is attached, the name, or mark, becomes at once the subject-matter of equitable protection. Here, as elsewhere, the eye of equity jurisdiction seeks out results, and though the immediate thing to be acted upon by the injunction is not itself, alone considered, property, it is enough that the act complained of will result, even though somewhat remotely, in injury to property.

"Considering that in such case equity without question, lays its restraining hands upon the injurious appropriation of words that belong to the common language of mankind—than which nothing could be freer to the uses of men—there ought, it would seem, to be no difficulty, in the case under consideration, to find the power so manifestly needful. The case under consideration may be summed up as follows: The business of appellee is that of a carrier of information. The gist of its service to the patron is that, by such carriage, the patron acquires knowledge of the matter communicated earlier than those not thus served. The ticker, with its printed tape, is an implement or means only to this commercial end, which the patron, or the patron's patron, may utilize to the end intended but may not appropriate to some end not intended, especially if such appropriation result in injury to, or total destruction of, the service. In short, the law being clearly inadequate to that purpose, equity should see to it that the one who is served and the one who serves each gets what the engagement between them calls for, and that neither, to the injury of the other, shall appropriate more."

Professor Langdell, in discussing trade-marks and good will in his book entitled "A Brief Survey of Equity Jurisdiction," has expressed much the same theory that Judge Grosscup elaborated in the opinion above quoted, and has pointed out that the wrong in such a case is not a tort to any particular thing, but—

"to the estate of the person injured in the aggregate, to the universitas of his estate (as the Romans call it), consisting, as it does, in making him so much poorer. Of this description are many species of fraud, for example, the so-called infringement of a trade-mark or of good will, which consists in wrongfully and fraudulently depriving another person of customers whose patronage he would otherwise have received."

I think sufficient analogies exist, particularly in the stock and grain quotation cases which I have cited, for holding that the damage to the complainant, which arises by taking from early editions of newspapers published by its members information which it has gathered at great cost, constitutes a tortious invasion of its rights unless, as a matter of public policy, adequate cause can be shown for holding that the partial disclosure to the public arising from the publication in some of the newspapers that are members of the Associated Press should deprive it of further right to restrict the use of its news.

[7] The question remains whether there is any sufficient ground in public policy for depriving a news service of the fruits of its labors merely because a limited number of its customers have already been allowed to publish the news. Undoubtedly the public is legitimately interested in and benefited by the dissemination of news, and the dissemi-

nation, when once begun, should not be too long delayed; but no adequate reason occurs to me for allowing a competitor to sell and disseminate the news obtained through the efforts of the gatherer until the ordinary customers of the gatherer, within the field in which it operates, have had sufficient time to receive and publish the news. The newspapers which have a contract with the news service which acquired the information will secure it at once, and the papers that have not such a contract can receive it from the rival agency within three or four hours, which ought to be sufficient time to protect the business interests of the news service that first acquired it. I can see no harm to the public in such an adjustment of the correlative rights of the parties; and this conclusion is most reasonable. Concededly the complainant can withhold news from the public, and no one is entitled to it prior to publication. The object of its business, however, is to disseminate information. To serve its customers efficiently, it must communicate the news at the earliest possible time. Its effort is to give out its news at once for immediate publication. The publication intended, and generally effected, is one substantially simultaneous throughout the country; that is, so far simultaneous as geographical differences in time may permit. It cannot, therefore, be said that the complainant has in any fair sense caused its news to be published, and thus abandoned it to the public, until all the members whom it serves have been put in a position where publication of the news has been possible.

Viewed in this reasonable light, the argument that the complainant has no further right to protection after the first publication of its news loses much of its force. The news is in effect unpublished and unavailable for use by competing news agencies until the time for general publication has elapsed, since only then can the complainant be truly said to have abandoned its news to the public by an unrestricted publication. Nor can it in my opinion be said that the complainant is barred from asserting its rights in this case after publication, because it has acted inequitably in making use of "tips" received from the defendant. Both parties have in this respect acted in substantial accordance with common business practice, and under the belief that their conduct was technically lawful. Under such circumstances neither should be debarred from asserting its legal right and obtaining the protection of a court of equity, but a court of equity should only enforce this right if the other party to the suit is awarded similar protection.

[8] The defendant urges that it should not be subjected to an injunction restraining it from abstracting complainant's news, because any acts of this nature which have been done were contrary to defendant's rules and the directions of its officers. I should be inclined to take this view, were it not for the fact that the conduct of the representatives of defendant in responsible positions has shown such a serious and systematic infraction of complainant's rights, in numerous cases specified in careful detail, that I cannot think anything less than an injunction sufficient to meet the situation. Furthermore, defendant, if I understand its argument, still insists upon its right to obtain the Cleveland local news in the manner heretofore practiced, although this is clearly in violation of complainant's rights. Upon the proofs offered, a

preliminary injunction should be granted to the complainant, restraining the defendant from abstracting its news before publication.

[9] While I am personally satisfied, after giving the matter most deliberate and careful consideration, that the right exists to prevent the sale by a competing news agency of news which is taken from early publications of complainant's members before sufficient time has elapsed to afford opportunity for general publication, and that the existing practice amounts to unfair trade, yet the matter is one of first impression, and my decision cannot be regarded as sufficiently free from doubt to justify the granting of a preliminary injunction upon this branch of the case.

Settle order on notice.