BEFORE THE SECOND DIVISION, DECEMBER 6, 1956

**No. 60405.**—Oxford University Press, N. Y., Inc. *v.* United States, protest 153105–K (New York).

Rao, Judge: This is an action for the recovery of excess duties alleged to have been assessed against an importation of books known as the "Oxford Dictionary of Quotations." The collector of customs classified the same within the provisions of paragraph 1410 of the Tariff Act of 1930, as modified by the trade agreement with the United Kingdom, 74 Treas. Dec. 253, T. D. 49753, as books, other than those of foreign authorship, and, accordingly, assessed duty upon the importation at the rate of 20 per centum ad valorem.

Plaintiff claims that said books are wholly, substantially, or chiefly of foreign authorship, within the contemplation of said paragraph 1410, as modified, *supra*, and that, therefore, duty should have been assessed at the rate of 7½ per centum ad valorem.

Paragraph 1410 of the Tariff Act of 1930, as modified by the trade agreement with the United Kingdom, *supra*, reads as follows:

Unbound books of all kinds, bound books of all kinds except those bound wholly or in part in leather, sheets or printed pages of books bound wholly or in part in leather, pamphlets, music in books or sheets, and printed matter, all the foregoing not specially provided for (except unbound or bound prayer books and sheets or printed pages of prayer books; except tourist literature containing historical, geographic, time table, travel, hotel, or similar information, chiefly with respect to places or travel facilities outside the continental United States; and except diaries):

| | |
|---|---|
| If of bona fide foreign authorship | 7½% ad val. |
| All other | 20% ad val. |

As its name implies, the book in question, the unbound pages of which are in evidence as plaintiff's exhibit 1, is a compilation of quotations, comprehensively indexed. Testimony concerning the production of this volume was introduced by plaintiff through the medium of interrogatories addressed to Gerard Walter Sturgis Hopkins of London, England, a British subject and an employee of Oxford University Press of London, England, by whom the subject volumes were published.

It appears that when publication of a volume of this nature was first contemplated, Sir Humphrey Milford, head of the firm, set up an *ad hoc* committee to compile and arrange the work, with the witness as chairman. Other regular members of the committee, all of whom were stated to be of British nationality, based upon Hopkins' personal acquaintance with them, were identified as Charles Williams (now deceased), Frederick Page, Miss Phylis Jones (presently Mrs. Phylis McDougall), and her successor, Miss Alice Mary Smythe, now Mrs. Hadfield. From time to time, other persons—well-known authors, editors, authorities in various fields—were consulted about their specialties and asked to submit lists of suitable quotations.

The activities of this committee essentially involved the selection of material to be included in the book and the rejection of matter considered to be unsuitable, predicated upon a theoretical standard of familiarity. It consisted of "choosing what material we thought was necessary and arranging for its use in the dictionary, its placing and its general appearance." The members met at regular intervals over a 5-year period, at which time existing dictionaries were read aloud and discussed from the point of view of the advisability of retaining or rejecting the quotations therein contained. In addition, each of the members covered a separate section of English literature for the purpose of extracting new material for inclusion in the volume. Findings of the individuals were reported to and discussed by the full committee. When the committee agreed upon any recommendations, its choice was considered final. Where there was a disagreement

in committee, Sir Humphrey Milford made the ultimate decision. The great task of indexing the dictionary was assigned to Mrs. McDougall and afterwards handed over to her successor, Mrs. Hadfield, who completed it.

In other words, into the creation of this particular literary work, in the form in which it went to press, went considerable mental effort on the part of the members of the committee. It embodied the results of their research, individual and joint, and the selection of material extracted from the vast body of literature. This was no mere mechanical collection of theretofore published items. It was a compilation with a purpose, namely, to set forth in a defined schematic form a great number of quotations, specially selected to meet the test of familiarity.

Counsel for plaintiff adverts to the principles of law expressed in *Oxford University Press, N. Y., Inc.* v. *United States*, 33 C. C. P. A. (Customs) 11, C. A. D. 309, as being here controlling and, we think, with good reason. The merchandise the subject of decision in the cited case was an anthology entitled "The Oxford Book of English Verse," consisting of reproductions and/or excerpts of poems of some 300 foreign and 10 American poets, introduced by prefaces, acknowledgments, and table of contents, and including indices and glossaries, the text of all original material having been written by the anthologist, Sir Arthur Quiller-Couch, a British national. In determining whether the volume could be regarded as of *bona fide* foreign authorship, the court found that an anthology was *per se* susceptible of authorship; that the author was the individual through whose "intellectual labor" and "rare literary skill" that particular volume came into being, to wit, the anthologist; and that, since the author was a British subject, the book was of *bona fide* foreign authorship.

Our appellate court alluded to several leading cases on the issue of what constitutes authorship, within the purview of our copyright laws, particularly that of *National Tel. News Co.* v. *Western Union Tel. Co.*, 119 Fed. 294, wherein the following statements may be found:

* * * Generally speaking, authorship implies that there has been put into the production something meritorious from the author's own mind; that the product embodies the thought of the author, as well as the thought of others; and would not have found existence in the form presented, but for the distinctive individuality of mind from which it sprang. A mere annal, on the contrary, is the reduction to copy of an event that others, in a like situation, would have observed; and its statement in the substantial form that people generally would have adopted. A catalogue, or a table of statistics, or business publications generally, may thus belong to either one or the other of these classes. If, in their makeup, there is evinced some peculiar mental endowment—the grasp of mind, say in a table of statistics, that can gather in all that is needful, the discrimination that adjusts their proportions—there may be authorship within the meaning of the copyright grant as interpreted by the courts. * * *

It then went on to say:

Running through all the cases is the controlling principle that for a thing to be the work of an "author," it must be something that is more or less the product of mental activity as distinguished from that which is purely mechanical.

That the volume here under consideration is a "product of mental activity as distinguished from that which is purely mechanical" has been affirmatively established. Since the effort exerted in preparing the volume was joint and contemporaneous, coauthorship, rather than individual authorship, resulted. But this is no bar to a finding that the "Oxford Dictionary of Quotations" is of *bona fide* foreign authorship, as each of the coauthors has been shown, at least *prima facie*, to be a British national. The subject books are, therefore, dutiable at the rate 7½ per centum ad valorem, as provided in said paragraph 1410, as modified, *supra*, as books of *bona fide* foreign authorship.

Judgment will be entered accordingly.