OXFORD UNIVERSITY PRESS, N. Y., INC. *v.* UNITED STATES (No. 4491)[1]

---

[1] C. A. D. 309.

United States Court of Customs and Patent Appeals, May 24, 1945

*Lane & Wallace* (*Thomas M. Lane* and *William H. Fox* of counsel) for appellant. *Paul P. Rao*, Assistant Attorney General (*Sybil Phillips* and *Richard F. Weeks*, special attorneys, of counsel), for the United States.

[Oral argument April 10, 1945, by Mr. Lane and Mr. Rao]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges

BLAND, Judge, delivered the opinion of the court:

In the year 1941 the Oxford University Press, N. Y., Inc., an American representative, agent, or affiliate of the Oxford University Press of England, imported into this country from England certain unbound books, which were classified under paragraph 1410 of the Tariff Act of 1930, as modified by the trade agreement with the United Kingdom, T. D. 49753, and assessed with duty at 20 per centum ad valorem as falling within the provision for "All other" books than "of bona fide foreign authorship."

The importer protested the said classification and assessment of duty, claiming that the merchandise was of bona fide foreign authorship and therefore dutiable at 7½ per centum ad valorem under the same paragraph as modified by the said trade agreement.

Paragraph 1410 of the Tariff Act of 1930 as modified by the said trade agreement reads as follows:

| Tariff Act of 1930; paragraph | Description of article | Rate of duty |
|---|---|---|
| 1410 | Unbound books of all kinds, bound books of all kinds except those bound wholly or in part in leather, sheets or printed pages of books bound wholly or in part in leather, pamphlets, music in books or sheets, and printed matter, all the foregoing not specially provided for (except unbound or bound prayer books and sheets or printed pages of prayer books; except tourist literature containing historical, geographic, time table, travel, hotel, or similar information, chiefly with respect to places or travel facilities outside the continental United States; and except diaries): | |
| | If of bona fide foreign authorship | 7½% ad val. |
| | All other | 20% ad val. |

The case was submitted to the trial court upon stipulations of the pertinent facts, which may be summarized, as in appellant's brief, as follows:

"The Oxford Book of English Verse" is an anthology containing altogether 1141 pages of printed text, consisting of reproductions of poems, or of excerpts therefrom, written by approximately 300 foreign authors and 10 American authors, and of original text, written by the producer of the manuscript, in the form of prefaces, acknowledgments, table of contents, index of authors, index of first lines, glossaries of archaic and otherwise difficult words, etc. Of the 1141 pages of printed text, 28 pages (2.45 per centum thereof) consist of reproductions of poems written by American authors.

The manuscript of the whole book was produced and prepared for publication by Sir Arthur Quiller-Couch, who is and always has been a subject of Great Britain. His work in producing the manuscript consisted in a survey of poetry written in the English tongue over a period of nearly 700 years, reproducing in his work the poems selected by him, or typical excerpts therefrom, modernizing certain of the spelling, arranging the material in the chronological form in which it appears in the book, and writing the prefaces, indexes, glossaries and other explanatory portions of the work as indicated above.

The importation consisted of unbound sheets of the work, printed and published in Great Britain, which were bound in the United States.

To the above description may be added, as an illustration of the intellectual effort required to produce such a volume, the following statement by the author in his preface:

Care has been taken with the texts. But I have sometimes thought it consistent with the aim of the book to prefer the more beautiful to the better attested reading. I have often excised weak or superfluous stanzas when sure that excision would improve; and have not hesitated to extract a few stanzas from a long poem when persuaded that they could stand alone as a lyric. The apology for such experiments can only lie in their success: but the risk is one which, in my judgment, the anthologist ought to take. A few small corrections have been made, but only when they were quite obvious.

The United States Customs Court, Second Division, overruled the protest, and from its judgment the importer has here appealed.

As we understand it, there is but one issue to determine, to wit:

Is the imported volume of bona fide foreign authorship? As stated by the trial court, in certain respects the issue here is one of first impression, since we know of no decision of any court which involved the exact question here presented and certainly none of them involved the same facts.

The instant issue, when boiled down to its fundamentals, involves a determination of whether or not the greater amount of printed matter, which consists of poems in the English language by many English and a few American poets, is what Congress had in mind when it used the term "if of bona fide foreign authorship," or whether the anthology prepared by the English subject is to be regarded as the subject matter of the foreign authorship.

The trial court concluded, first, that the instant compilation of verses and the whole arrangement of the book by the compiler were susceptible of authorship; second, that the various poems being the work of "co-authors," the volume was a compilation of poems of well-known authors, and that the compiler's selection and arrangement, although requiring mental effort and ability, did not involve the authorship contemplated by the statute; and third, that the 28 pages of the 1,141-page volume, which embraced the work of. the American poets, were substantial and could not be ignored in determining whether or not the book was wholly or substantially of foreign authorship. It concluded, upon the premises hereinbefore stated, that since portions of the book here in question were of American authorship in substantial quantity, the volume as a whole could not be regarded as of "bona fide foreign authorship."

The Government before this court conceded, agreeably to the holding of the court below, that the book was susceptible of authorship.

It seems to us that the trial court, in the decision of the instant issue, and counsel for the Government, in argument here, have given unwarranted effect to certain decisions of this court relating to the subject of authorship of imported books. We are of the opinion that the contentions of the Government and the findings of the trial court heretofore recited, for the most part, are erroneous, and that the contentions of the importer must be sustained. To arrive at this conclusion, we think it necessary to discuss some of the cases relied upon by the Government and the trial court.

The word "author" is defined in Webster's New International Dictionary (1939) as follows:

*author* * * * *n.* * * * 1. The originator or maker of anything; hence, efficient cause of a thing; creator; originator;

2. One who composes or writes a book, story, document, or the like; a composer, as distinguished from an editor, translator, or compiler; also the writings of an author.

*Author* is sometimes, by extension, applied to one who compiles for publication material which in its totality constitutes an original contribution.

In *United States* v. *Field,* 14 Ct. Cust. Appls. 376, T. D. 42031, this court had before it a portfolio consisting of a front and back cover, between which were inserted and bound together in book form, samples of half-linen handkerchiefs. On the front cover was a statement that the volume contained sample pieces of handkerchiefs, with labels pasted on together with numerals and the name of the merchant handling them. The first question to arise was whether this alleged volume or book was of bona fide foreign authorship. The court determined that it was not for the reason that it was a mechanical production and was not "susceptible of authorship as that word is used in the paragraph," and in so holding the court quoted a portion of Webster's definition (2) of "author" as set out above. That definition, of course, was considered only with respect to deciding that particular issue, to wit: whether or not a book of handkerchiefs was the subject of authorship. The definition quoted may have little effect upon the holding in the instant case, in view of considerations to which we shall later allude. It is true that in that case the court, in referring to Webster's definition, stated, "There are other meanings given to these words, but we think the foregoing is the sense in which the word 'authorship' is used in paragraph 1310. A mere mechanical production, such as the importations here, is not, we think, susceptible of authorship as that word is used in the paragraph." Of course, that language called attention to the meaning of the word as applied to the question as to whether or not it was susceptible of authorship.

A wholly different issue is presented here. Since concededly and unquestionably the subject matter and all portions of the printed matter of the instant volume are the subject of authorship, we are presented with the question as to whether or not Congress, by the use of the term "bona fide foreign authorship," meant it to apply to an anthology like the one involved here, or whether it had in mind that the word "authorship" should have relation only to that portion of the book which was originally written by someone other than the compiler. So, we think the language used in the *Field* case should not be regarded as controlling in the instant case, because the instant issue, as hereinbefore stated, was not there presented.

In *United States* v. *American Railway Express Co. et al.,* 17 C. C. P. A. (Customs) 10, T. D. 43317, the issue was whether or not a number of publications issued by the Canadian National Railways were susceptible of authorship. The publications were printed for gratuitous distribution, furnishing information to persons making inquiries. They covered a large range of subjects, such as descriptions of localities accessible through the use of the railways, details as to fishing,

hunting, and camping—the same being profusely illustrated. Some of the articles contained hundreds of pages of reading matter, while others contained only lists of resorts, timetables, and similar information. The court quoted Webster's definition of the word "author" as set out in the *Field* case, *supra*, and stated: "Accepting the definition as thus given of an author, as 'one who composes or writes a book, a composer as distinguished from an editor, translator, or compiler,' it is evident to the court that the exhibits before us are susceptible of authorship." The court held that the merchandise was of bona fide foreign authorship. That case stands in the same category as the *Field* case. The definition of the word "author" for the purpose of determining the susceptibility of authorship was accepted. As before stated, a different issue is presented here.

There are many decided cases which determine, under various circumstances, the scope of meaning to be given to the word "author." The Constitution, art. I, § 8, cl. 8, provides:

The Congress shall have Power * * * To promote the Progress of Science and useful Arts, by securing for limited Times to *Authors* and Inventors the exclusive Right *to their respective Writings* and Discoveries. [Italics ours.]

The first Congress, composed of a number of prominent members of the Constitutional Convention and their contemporaries, enacted the first so-called copyright law to take care of the "Writings" of "Authors." 1 Stat. 124 (1790). That act provided for protection to the authors of maps, charts, and books. As time went on, the act was amended a number of times, each time to bring further items within the scope of copyright protection. Some of these items, such as photographs, were not known when the Constitution was adopted or the early laws were enacted. Finally, by 1909, copyright protection had been extended to a wide range of literary, artistic, and utilitarian property. It included such articles as business catalogs, circulars containing market quotations, sheets, such as Dun and Bradstreet's, directories, lithographs, photographs, and many other articles—all of which, however, required more than mechanical operation to produce. In the Copyright Act of March 4, 1909, express provision was made for "Books, including composite and cyclopedic works, directories, gazetteers, and other compilations." 35 Stat. 1076, 17 U. S. C. § 5.

Long ago, in copyright infringement suits, the power of Congress to extend copyright protection to such articles as photographs, etc., within the meaning of the constitutional provision for "Writings" of "Authors" was challenged; and without exception, so far as we have been able to learn, the higher courts have uniformly held that such creations as involved the mental processes, even though they be photographs, were included within the spirit and language of the constitutional provision. It would serve no useful purpose to further

discuss the history of copyright legislation and the numerous pertinent holdings of the courts relative thereto, for it will be sufficient to call attention to a few of the leading cases, in which much of the said history and many of the pertinent discussions are referred to.

A celebrated and much-cited case on this subject is *National Tel. News Co.* v. *Western Union Tel. Co.*, 119 Fed. 294 (1902), which involved the infringement of a copyrighted news tape, which tape, when used with certain apparatus, permitted the transmission and redistribution of news over wire to numerous clients in a short time. There the Circuit Court of Appeals, Seventh Circuit, speaking through Judge Grosscup, after reviewing the history of the copyright law and certain holdings concerning the scope of the constitutional provision relating to the writings of authors, said:

* * * when the federal constitution was adopted * * * the publication of a book meant that literature, as Literature, had received an accession.

Unquestionably, the framers of the constitution, in vesting Congress with "power to promote the progress of science and the useful arts, by securing for limited times to authors and inventors exclusive right to their respective writings and discoveries," had this kind of authorship in mind; and were the intention of the framers of the constitution to give boundary to the constitutional grant, many writings, to which copyright has since been extended, would have been excluded. But, here as elsewhere, the constitution, under judicial construction, has expanded to new conditions as they arose. Little by little copyright has been extended to the literature of commerce, so that it now includes books that the old guild of authors would have disdained; catalogues, mathematical tables, statistics, designs, guide-books, directories, and other works of similar character. Nothing, it would seem, evincing, in its makeup, that there has been underneath it, in some substantial way, the mind of a creator or originator, is now excluded. A belief that in no other way can the labor of the brain, in these useful departments of life, be adequately protected, is doubtless responsible for this wide departure from what was unquestionably the original purpose of the constitution.

But obviously, there is a point at which this process of expansion must cease. It would be both inequitable and impracticable to give copyright to every printed article. Much of current publication—in fact the greater portion—is nothing beyond the mere notation of events transpiring, which, if transpiring at all, are accessible by all. It is inconceivable that the copyright grant of the constitution, and the statutes in pursuance thereof, were meant to give a monopoly of narrative to him, who, putting the bare recital of events in print, went through the routine formulae of the copyright statutes.

It would be difficult to define, comprehensively, what character of writing is copyrightable, and what is not. But, for the purposes of this case, we may fix the confines at the point where authorship proper ends, and mere annals begin. Nor is this line easily drawn. Generally speaking, authorship implies that there has been put into the production something meritorious from the author's own mind; that the product embodies the thought of the author, as well as the thought of others; and would not have found existence in the form presented, but for the distinctive individuality of mind from which it sprang. A mere annal, on the contrary, is the reduction to copy of an event that others, in a like situation, would have observed; and its statement in the substantial form that people generally would have adopted. A catalogue, or a table of statistics, or business publications generally, may thus belong to either one or the other of these classes. If,

in their makeup, there is evinced some peculiar mental endowment—the grasp of mind, say in a table of statistics, that can gather in all that is needful, the discrimination that adjusts their proportions—there may be authorship within the meaning of the copyright grant as interpreted by the courts.  *  *  *

Prior to that case, in *Burrows-Giles Lithographic Co.* v. *Sarony*, 111 U. S. 53 (1884), the United States Supreme Court, in an opinion by Mr. Justice Miller, had further extended the already broad meaning given to the words "Writings" and "Authors" in the constitutional provision by holding that a photograph of Oscar Wilde, which required intellectual conception by the photographer in posing the subject and arranging the surroundings, and which involved originality of thought and novelty in the intellectual operation connected with the visible product in the shape of a picture, was entitled to copyright protection;

Running through all the cases is the controlling principle that for a thing to be the work of an "author," it must be something that is more or less the product of mental activity as distinguished from that which is purely mechanical.

Now, of course, it is at once obvious that it might be concluded that the framers of the Constitution and the Congress in enacting the copyright laws might have used the word "author" in a broad sense (such as is defined in Webster's definition No. 1, *supra*), while the Congress in 1922, when the term "authorship" here under consideration first found its way into a tariff paragraph, may have used the term in a narrower sense (as in Webster's No. 2, *supra*). It must be remembered, however, that all the decisions with respect to the breadth of the term "author" were in existence and presumably thoroughly understood by Congress when it passed the Tariff Act of 1922, and we find nothing in the legislative history which would require giving a meaning to the term "if of bona fide foreign authorship" so narrow as to exclude an anthology or compilation possessing the qualities described in the stipulated facts in the instant record.

The legislative history concerning the provision here in controversy is very meager. We have examined the various reports of the committees, debates in the Senate where the amendment including the provision arose, etc., and find little if anything that is helpful there. It does appear, however, that before the Senate Finance Committee, certain parties representing the United States bookbinders appeared and testified that American writers were shipping their unbound volumes abroad and having them there bound and returned on account of the difference in cost owing to the cheapness of labor abroad. See Sen. Doc. 108, Hearings before the Senate Finance Committee on H. R. 7456, 67th Cong., 2d Sess. (1922) 3966–3970. It would seem, therefore, that at least one of the reasons for the enactment of the controverted provision, first in paragraph 1310 of the Tariff Act of 1922, and later, without change, in paragraph 1410 of the Tariff Act of 1930, was to protect the American bookbinders.

Section 15 of the Copyright Act, 35 Stat. 1078, 17 U. S. C. §15, requires that a book, if in the English language, must, in order to be entitled to the full term of copyright protection, be printed from type set in the United States, or from plates made from type set in the United States, etc., and bound in the United States. It is true that section 21 of that law, 17 U. S. C. §21, provides that a book first published abroad in the English language may have *ad interim* copyright protection by a deposit in the Copyright Office of one of the copies within 60 days after publication. The *ad interim* copyright does not endure longer than the expiration of 4 months after the deposit of the copy. But in order to have the copyright protection extended to the full term, it is provided by section 22, 17 U. S. C. §22, that within the period of *ad interim* protection an authorized edition must be published within the United States in accordance with the manufacturing provisions of section 15.

Thus it is seen that these sections of the copyright law were designed to protect the American printers, lithographers, bookbinders, etc. To that extent, therefore, the copyright law, which was enacted in 1909 prior to the passage of the Tariff Act of 1922, and the tariff provision here in controversy have a common purpose—which is tersely stated in the title of the Tariff Act of 1922, "to encourage the industries of the United States," and in the title of the Tariff Act of 1930, "to encourage the industries of the United States" and "to protect American labor." Therefore, it would seem that the tariff provision here in controversy and the copyright provisions are, in a sense, *in pari materia* and should be construed together. This conclusion, we think, makes particularly pertinent a consideration of some aspects of the broader definitions of the term "author" as found in the decided cases relating to the copyright law.

The Government urges that it is "significant" that Congress in enacting the copyright law specifically provided for such works as "compilations" and made no such express provision in the tariff act. This is readily understandable when we consider that many of the things which are regarded as "authored" in a copyright sense are not books. The particular provision we are considering here relates to unbound books. Moreover, it is understandable why, in the preparation of the whole Tariff Acts of 1922 and 1930, devoting many paragraphs to different kinds of articles protected under the copyright laws, Congress would not desire to go into such detail in preparing a single paragraph relating to books. It is also to be noted that in the 1922 act, as well as in the 1930 act, Congress separately treated various kinds of books and other printed and lithographed matter as well as many other related articles which had appeared in the dutiable as well as the free list of the tariff act of 1913. We think this matter is not of sufficient importance to require here a more detailed statement in

connection with changes made in the last two tariff acts from the act of 1913 or as to why Congress did not see fit in the Tariff Acts of 1922 and 1930 to specifically mention anthologies, compilations, etc.

There is nothing in this situation that suggests that when Congress used the terms "Unbound books of all kinds" and "if of bona fide foreign authorship," it did not intend to include such books as the one at bar—an anthology or compilation produced by an eminent and erudite writer, in the production of which much intellectual labor was expended and rare literary skill applied.

We therefore conclude that the authorship of the unbound book at bar is foreign, and that it cannot be said that the poems and parts of poems themselves should be regarded as the subject matter to which the term "if of bona fide foreign authorship" applies. In this view of the case, it makes no difference whether the portion of the contents of the volume (2.45 per centum of the whole) consisting of poems originally written by American poets is substantial or otherwise. The rule of *de minimis* is not involved.

We think the trial court fell into error in holding that the American poets and the English poets were "co-authors" of the imported volume. Co-authorship implies a joint work in preparing the volume, article, or other printed subject matter. It necessarily implies that co-authors are contemporaries. The poets represented in the instant volume, whose works range over the period from 1250 to 1918, could hardly be regarded as co-authors of the volume.

In arriving at the foregoing conclusion, it has not been necessary for us, in considering the meaning of the terms "author" or "authorship," to go so far as to adopt as broad a meaning as the courts have done with reference to the constitutional provision relating to the "Writings" of "Authors"; nor is it necessary for us here to decide, and we do not decide, that a mere compilation by a foreigner would meet the requirements of the tariff law. The instant volume is obviously much more than a compilation. It is not difficult to conceive of a mechanical putting together of a great number of writings by others which would involve no intellectual effort whatever. Just where the dividing line should be drawn we need not here determine.

Another consideration has been brought to our attention which we think may have some bearing upon the soundness of our holding herein. In *Kelly Publishing Co.* v. *United States*, 56 Treas. Dec. 108, T. D. 43493, the United States Customs Court, in 1929, held that "Kelly's Directory of Merchants, Manufacturers and Shippers of the World," compiled by a foreigner, was susceptible of authorship and dutiable as a book of bona fide foreign authorship under paragraph 1310 of the Tariff Act of 1922 (the prototype of present paragraph 1410). The court there said:

The remaining two volumes entitled "Kelly's Directory of Merchants, Manufacturers and Shippers of the World" contain advertisements and statistical

information of individuals and concerns located throughout the world; also in addition to indexes of firms and the industries in which they are engaged, the books contain statistical information of different countries, as to population, amount of imports and exports, etc. It appears of record that these data are procured from every part of the world; that the books in their published form are the works of an Englishman located in the home office of the publishing company, and who, from the testimony of the witness, "goes through all the copy material and decides what shall be put in."

Congress subsequently enacted paragraph 1410 of the Tariff Act of 1930, here under consideration, without any change of language in respect with which we are here concerned. While this may not be a controlling consideration, it is a matter we think proper to consider along with the other matters to which we have adverted.

The Government here relies to some extent, in support of its position, on the decision of the United States Customs Court in the case of *Oxford University Press, Inc. (New York)* v. *United States*, Abstract No. 29385, 66 Treas. Dec. 1095 (1934) that a two-volume work entitled "The Letters of Robert Burns" (710 letters) was wholly or substantially wholly of foreign authorship. In addition to the letters, the volumes contained a preface, introduction, footnotes to the letters, glossary, appendix, and bibliography, written by one Ferguson, a citizen of the United States. The court held that the contribution of Ferguson was merely data to facilitate the reading of the letters and in deciding the question applied "authorship" to the Burns letters rather than to the book as imported. The protestant in that case is the appellant in this case. Counsel for appellant here urges that the protestant was in error in its contentions before the trial court in that case. While the appellant here seems to have changed its position from that taken in said case, it is equally obvious that the collector was at that time of the opinion that what was done in the United States toward producing the volumes prevented the letters of Robert Burns from being determinative of the question of foreign authorship. While the facts in that case differ from the facts in this case, it would seem clear that the holding there is not in harmony with our holding here, and the same will be disregarded.

The judgment of the United States Customs Court is *reversed*.