**TIME INCORPORATED, Plaintiff,**

v.

**BERNARD GEIS ASSOCIATES, Bernard Geis, Josiah Thompson, and Random House, Inc., Defendants.**

**No. 67 Civ. 4736.**

United States District Court
S. D. New York.

Sept. 24, 1968.

Cravath, Swaine & Moore, New York City, for plaintiff; Harold R. Medina, Jr., New York City, of counsel.

Brown, Cross & Hamilton, New York City, for defendants Bernard Geis Associates, Bernard Geis and Random House, Inc.

Weil, Gotshal & Manges, Horace S. Manges, E. Douglas Hamilton, Edward C. Wallace, John D. Kousi, Marshall C. Berger, New York City, of counsel.

WYATT, District Judge.

This is a motion by plaintiff for summary judgment "interlocutory in character" on the issue of liability alone, as authorized by Rule 56(c) of the Federal Rules of Civil Procedure.

Time Incorporated (Time Inc.), the plaintiff, is a corporation which, among other things, publishes "Life", "Time" and "Fortune" magazines; it also publishes books; and it has "Broadcast divisions" (Hardy affidavit, p. 7), the operations of which are not explained but presumably involve radio or television broadcasting or both. The events in suit principally concern "Life" magazine, which is an activity or division of Time Inc. and is not a separate corporation. For simplicity, however, the word "Life" is hereafter often used in describing or in referring to events when the more technically correct expression would be "Time Inc.", the plaintiff.

When President Kennedy was killed in Dallas on November 22, 1963, Abraham Zapruder, a Dallas dress manufacturer, was by sheer happenstance at the scene taking home movie pictures with his camera. His film—an historic document and undoubtedly the most important photographic evidence concerning the fatal shots—was bought a few days later by Life; parts of the film were printed in several issues of the magazine. As to these issues and their contents (including, of course, the Zapruder pictures) and as to the film itself, Life has complied with all provisions of the Copyright Act (17 U.S.C. § 1 and following; the Act).

Defendant Thompson has written a book, "Six Seconds in Dallas" (the Book), which is a study of the assassination. It is a serious, thoughtful and

impressive analysis of the evidence. The Book contains a number of what are called "sketches" but which are in fact copies of parts of the Zapruder film. Defendant Bernard Geis Associates (Associates), a partnership, published the Book on November 18, 1967 and defendant Random House, Inc. has been distributing the Book to the public. Defendant Bernard Geis is the only general partner of Associates.

This action was commenced on December 1, 1967. The complaint in a single count charges that certain frames of the Zapruder film were "stolen surreptitiously" from Life by Thompson and that copies of these frames appear in the Book as published. The complaint avers that the conduct of defendants is an infringement of statutory copyrights, an unfair trade practice, and unfair competition.

While the word "frame" with respect to motion picture film is generally understood, it may be advisable briefly to explain it. A motion picture consists of a series of photographs showing the objects in a scene in successive positions slightly changed. When the series is presented in rapid succession, the optical effect is of a picture in which the objects move. Each separate photograph in the series is called a "frame". Webster's Third New International Dictionary, pp. 902, 1475.

There is jurisdiction of the claims in the complaint. 28 U.S.C. § 1338.

There is jurisdiction of the persons of defendants, except for Thompson, an assistant professor of philosophy at Haverford College in Pennsylvania who has not been served with process in New York as required (Fed.R.Civ.P. 4(f)) and who has not appeared. As used hereafter, the word "defendants" does not include Thompson unless the context indicates otherwise.

Defendants answered on January 15, 1968 and on the same day served a demand for trial by jury. Fed.R.Civ.P. 38(b).

The answer in substance denies that plaintiff has any claim, then pleads nine affirmative defenses, and then pleads the nine affirmative defenses as a partial defense. The affirmative defenses are as follows: first, consent; second, that the Zapruder film could not be the subject of copyright because not original; third, that the Zapruder film could not be the subject of copyright because it could be made "in only a limited number of ways" and to allow copyright would result in the appropriation of the subject matter * * * by a limited number of copyright proprietors"; fourth, through seventh, fair use; eighth, that the Book is protected by the First Amendment and on that account an injunction cannot issue; and ninth, that an injunction will cause defendants irreparable harm.

After answering and in January 1968, defendants took the depositions of four Life employees: Loudon Wainwright, a writer; Edward Kern, an associate editor in the Department of Special Projects; Richard O. Pollard, Director of Photography; and Richard Billings, until 1964 Bureau Chief in Miami, then until early 1966 (and in New York) Assistant Director of Photography, and since then an associate editor in the Department of Newsfronts.

Apparently in contemplation of a motion for summary judgment and under date of May 1, 1968, the parties made a fourteen page stipulation of facts to which there are numerous exhibits.

The motion is based on the stipulation and also on affidavits of Pollard, Billings, Kern and Wainwright (all identified above), of John F. Dowd, Editorial Counsel of Time Incorporated, and of Jerome S. Hardy, Publisher of Life.

Defendants submit in opposition affidavits of Thompson, of Geis, of Don Preston (executive editor of Associates), of E. Douglas Hamilton (an attorney for Associates), of David S. Butterworth (an assistant of Thompson), of Theodore B. Hetzel (a Professor at Haverford),

and of Benjamin F. Price (a picture editor).

The parties filed statements under General Rule 9(g) of this Court.

Life states that the only issue to be tried is that of damages.

Defendants state that there are two issues to be tried: (1) whether Billings had authority to consent to the use in the Book of sketches of the Zapruder frames; and (2) whether defendants reasonably understood that the consent of Billings was to their use of the sketches which are in the Book.

■ In the memorandum submitted for defendants, it is asserted that they are entitled to summary judgment but, if found not so entitled, that there should be a trial of the issue whether plaintiff consented to use of the sketches in the Book. If defendants are entitled to summary judgment, it may properly be granted by the Court even without a written or formal motion. 6 Moore's Federal Practice (2d ed.) 2241–2246.

There is no genuine issue as to any material fact on the issue of liability alone. Some of the questions of law, ably argued on both sides, are difficult. The conclusion is that there must be summary judgment for defendants.

## I

The facts are almost entirely established beyond any dispute and without any dispute, except as expressly noted in the following recital.

### A. Making of the Film and its Purchase by Life

On November 22, Zapruder decided to make a motion picture film of the President passing by. He had an 8 millimeter color home movie camera with a "telephoto" lens. At first he thought to take the pictures from his office in an office building at 501 Elm Street, at the corner of Elm and Houston Streets where the President's car would make a left turn from Houston into Elm Street. Then he felt he could get better pictures on the ground, so he went down with several others from his office and walked along Elm Street toward a triple underpass trying to pick the best spot for his camera. He tried several places and finally settled on a pedestal of concrete about 4 feet high on a slope; from this point he could look up Elm Street away from the underpass and see the corner where the left turn would be made, after which the President's car would come toward and pass directly in front of him on its way to the underpass; it was a "superb spot" (the Book, p. 4) for his pictures. He tried out the camera, felt that he was not steady, and then had his receptionist come up on the pedestal and steady him while he ran the camera.

The procession came into view and with the speed control at "Run" (about 18 frames per second) Zapruder started his camera, not knowing the horror it would record. When the car came close to Zapruder, there were the sudden shots and the reactions of those in the car—all caught on Zapruder's color film.

On the same day—November 22—Zapruder had the original color film developed and three color copies made from the original film.

(There are about 480 frames in the Zapruder film, of which 140 show the immediate events of the shooting and 40 are relevant to the shots themselves. While working with the film, agents of the Secret Service or of the Federal Bureau of Investigation identified each frame with a number, beginning with "1" for the frame showing the lead motorcycles coming into view on Houston Street and continuing the numbers in sequence for the frames following; these numbers have since been used to identify the frames.)

On the same or the next day, Zapruder in his Dallas office turned over two copies of the film to the Secret Service, specifying that it was strictly for government use and not to be shown to newspapers or magazines because he expected to sell the film.

Life then negotiated with Zapruder and on November 25 by written agree-

ment bought the original and all three copies of the film (two of which were noted as then in the possession of the Secret Service) and all rights therein, for $150,000 to be paid in yearly installments of $25,000.

## B. Use of the Film by Life and by the Warren Commission

In its next edition (cover date November 29, 1963) Life featured some 30 of the Zapruder frames, calling them a "remarkable and exclusive series". Doubtless because of time pressure, the frames were in black and white.

Life published on December 7, 1963 a special "John F. Kennedy Memorial Edition". This featured 9 enlarged Zapruder frames in color, telling how they came to be taken and how they recorded the tragic sequence "with appalling clarity".

President Johnson on November 29, 1963 appointed a Commission with Chief Justice Warren as Chairman (the Commission) to investigate the killing of President Kennedy. This Commission on September 24, 1964 submitted its lengthy report (the Warren Report) and all the evidence before it.

The Commission made extensive use of the Zapruder film, and placed great reliance on it, as evidenced in the Report (for example, pp. 97, 98–115). Six of the Zapruder frames are shown in the body of the Report (at pp. 100–103, 108, 114) and some 160 Zapruder frames are included (in volume XVIII) in the Exhibits of the Commission printed and submitted with the Report.

At the request of the Commission and on February 25, 1964, Life took the original Zapruder film to Washington and showed it to representatives of the Commission, the FBI and the Secret Service.

Life then prepared for the Commission from the original film 3 sets of 35 millimeter color transparencies of those frames desired by the Commission, except for frames 207 through 212. It appears that these frames in the original had been accidentally damaged in han-

dling. Life could not supply copies from the original of these frames, but the two copies of the Secret Service made from the original were available and one of these was marked in evidence as Exhibit 904 (V Report 178). Life also made available to the Commission for its use in Washington the copy in Life's possession made from the original film.

■ There appears to be no privilege for the United States to use copyrighted material without the consent of the owner. A statute (28 U.S.C. § 1498(b)) gives a remedy in the Court of Claims for copyright infringement by the United States. Another statute (17 U.S.C. § 8) provides that publication by the government of copyrighted material does not cause any "abridgment" of the copyright and does not authorize "any use * * * of such copyright material without the consent of the copyright proprietor."

Life did in fact consent to use by the Commission of the Zapruder film and to its reproduction in the Report, provided a usual notice of copyright was given. Apparently this proviso was disregarded by the Commission.

Shortly after the submission of the Report, Life featured it in an issue (cover date, October 2, 1964) with a cover containing enlargements in color of five Zapruder frames. The text for the article on the Report was by a member of the Commission. The Zapruder film was described as "one of the most important pieces of evidence to come before the * * * Commission". Eight Zapruder frames, enlarged and in color, were printed alongside the text.

The Commission deposited in the National Archives all of its evidence and working papers; this would include at least one copy of the complete Zapruder film together with the transparencies supplied by Life. Researchers thus have access to the Zapruder film and to the Zapruder frames which were exhibits to the Commission Report. The Archivist states, however, that if anyone asks for copies of the film he or she is advised: "Life Magazine has advised us that

while it will permit the film to be shown to qualified researchers, it cannot permit the reproduction of the film". The Archivist states that copies of the Zapruder frames will be furnished on request but that such copies are stamped on the back to indicate that permission to publish should be secured from Life.

The Report and its accompanying volumes of testimony were printed by the Government Printing office and so may be purchased from that office.

C. Criticism of the Report; Employment of Thompson by Life

There gradually developed a substantial volume of criticism of the Report, centered on its findings (Report, pp. 18, 22) that all the shots were fired from one place and that the person firing those shots acted alone.

Thompson was among those particularly interested in the Report; he became convinced that the Report was incomplete and he doubted its principal conclusion.

Thompson began studying the problem and was led to the evidence placed in the National Archives by the Commission. He apparently had an especial interest in the Zapruder frames and wanted to see the film and frames which Life had in the hope that these would be clearer than those in the Archives.

Thompson arranged to meet Billings; they talked together in September 1966. By this time Thompson had made a contract with Associates to write the Book.

By this time also a number of books had already appeared highly critical of the Warren Report; they attracted wide public attention and one of them went to the top of the best seller list for non-fiction. In this context, Life was then investigating the subject again, with another article in preparation and other articles in contemplation. Billings was engaged on this project.

Thompson and Billings discussed the assassination, the theories of Thompson, and that Thompson was writing a book. They must have talked about Thompson seeing the Zapruder film. Thompson says that he told Billings that his book "required use of certain frames from the Zapruder Film". Billings denies that there was any mention of any use of Zapruder film. Billings introduced Thompson to Kern who was also working on the article in preparation.

In its issue of October 7, 1966, Life published a one page editorial by Wainwright which advocated, by reason of the doubts raised by critics of the Report, that the national government reopen the matter.

On October 20, 1966, a meeting and luncheon, arranged by Geis, took place. Present were Wainwright, Kern and Billings (of Life), Geis and Preston (of Associates) and Thompson. Associates expected to publish the Book on which Thompson was then working. At the meeting and luncheon, there was discussion of Thompson's theories and of some sort of collaboration with Life, including that Thompson become a consultant to Life in the preparation of its expected article. Thompson says that Billings told him "in substance" that, if "permission could not be secured" to use the Zapruder frames, Thompson "could still write the Book using sketches that would be sufficient for [his] purposes". The moving affidavits do not agree that this took place and amount to denials. For purposes of this motion, plaintiff accepts the version of Thompson.

Beginning October 31, 1966, Thompson did become a consultant to Life under an oral agreement, later put in writing. He was paid a retainer, a monthly salary and his expenses; either side could terminate on 30 days notice.

In his affidavit (page 6), Thompson admits that, before he began work for Life, he was informed that Life would not give him permission to use copies of Zapruder frames in his Book.

Thompson worked principally with Kern and Billings. He did not work continuously in the Life offices but worked mostly at home, coming to the Life offices from time to time. He was not given access to the original Zapru-

# 136

der film, which (at least except rarely) was not used for study by anyone. Thompson was given access to an 8 millimeter copy (made from the original), to 35 millimeter slides and to 3 x 4 inch transparencies. The film copy was kept in an unlocked drawer in Kern's office desk. The slides and transparencies were kept in a locked cabinet in Billings' office and from time to time in the drawer of Kern's desk. When Thompson studied the Zapruder frames, he did so only in Kern's office, usually while Kern was there, but occasionally when Kern was not there.

On November 18, 1966, Kern left his office at the end of the business day. Thompson was there and remained there alone after Kern had gone.

Kern returned to his office in the late evening of the same day for some papers. It is undisputed that Kern then saw Thompson, alone, with his own camera making copies of Zapruder frames.

While a prohibition does not seem to have been spelled out to him and while it is too much to say that the copies were "stolen surreptitiously" by Thompson as averred in the complaint (para 32), it remains true that Thompson must have known that he should not make copies for himself of any Zapruder frames and that in doing so he was acting improperly. Aside from all other circumstances, the fact that Thompson was making the copies out of business hours, alone, and with his own camera shows his recognition of the impropriety.

But the reaction of Kern, and later of Billings and of Hunt (managing editor of Life) when informed of the incident, was most extraordinary. On the affidavits of Kern and Billings, no one at Life made any criticism to Thompson, made any correction of him, made any statement that he had done a prohibited thing, and no one asked for the film he had already exposed. He was allowed to develop his film and to keep the copies; presumably these copies were later used for the "sketches" here in suit. This passive attitude by the Life people, while not satisfactorily explained, does not excuse Thompson.

The written agreement under which Life employed Thompson as a consultant was dated November 23. He was paid a lump sum and a monthly salary plus expenses. He was to work on an article or articles about the assassination, planned to be published in the first half of 1967. Material supplied to Life *by Thompson*, including "any photographs you [Thompson] discover as part of your consultant research", was to be the property of Life but could be used by Thompson after July 1, 1967 in a "hard cover book". The agreement could be ended by either party on 30 days notice.

It is not without significance that this written agreement, while authorizing Thompson to use in his book "photographs" supplied by him to Life, has no provision authorizing Thompson to use Zapruder frames, either as "sketches" or otherwise.

D.  Further Use of the Film by Life

In its issue dated November 25, 1966, Life featured Zapruder frames in connection with its most prominent article: "A Matter of Reasonable Doubt". This article is the sole subject of the cover, on which a single color Zapruder frame is shown against a black background. The title of the frame is: "From the film: A key moment in the controversy". The reference is to the controversy over the Commission's conclusion that a single bullet hit both Governor Connally and the President. The article deals at length with Governor Connally's disagreement with this conclusion. There is a picture of the Governor studying "enlargements of the famous movie taken by Abraham Zapruder" which was said to be the "only unimpeachable witness" and, with the Governor's testimony, was said to be "basic to the question". Many Zapruder frames are reproduced in color in connection with the article. The conclusion of the article is: "the case should be reopened".

It is represented that plaintiff currently has "in an advanced planning

stage" a motion picture project dealing with the death of President Kennedy; that the Zapruder film will be the "key feature" of this project; that the projected film will be shown on television or in move theaters, or both; and that plaintiff has secured "at considerable expense" other material for use in this project (Hardy affidavit, p. 7). It is further represented that the Zapruder film will "undoubtedly" be used in future issues of Time and Fortune magazines, in books published by plaintiff, and by the "Broadcast divisions". (Hardy affidavit, p. 7)

### E. Release by Life of Certain Frames for Publication

Certain criticism of the Warren Report was based on the failure of that Report to print among its exhibits four of the Zapruder frames—numbers 208, 209, 210, and 211 (see volume XVIII of the Report, p. 19). The Zapruder frames from 171 through 334 are printed in sequence in volume XVIII of the Report (pp. 1–80) except for the four frames just indicated. There is no explanation for the omission. Some critics saw a significance to the omission and the expression "missing frames" began to be heard. (see The New Yorker magazine, July 13, 1968, pp. 68–69).

It has already been noted that Life could not supply the Commission with frames 207 through 212 made from the *original* film. But the Secret Service had two film copies made from the original film and Life had another. The Commission had a complete film. There thus were no "missing frames" and, to settle the matter, Life determined to release for publication frames 207 through 212. It did so on January 30, 1967, with an explanatory statement which gave this reason for the release: "to end what has become an irrelevant discussion".

### F. End of Thompson's Emloyment by Life

By mutual consent, the employment of Thompson by Life ended in late February 1967. This was apparently be-

cause Life dropped the idea of any further articles on the murder of the President. Thompson was paid for the period November 1, 1966 through February 28, 1967.

### G. Compliance by Life with Copyright Laws

On May 15, 1967, Life registered the Zapruder film in the Copyright office as an unpublished "motion picture other than a photoplay". 17 U.S.C. § 5(m); 37 C.F.R. § 202.15. The three issues of Life magazine in which Zapruder frames appeared had earlier been registered in the Copyright office as "periodicals". 17 U.S.C. § 5(b); 37 C.F.R. § 202.5. The Memorial Edition had been registered in the Copyright office as a book. 17 U.S.C. § 5(a); 37 C.F.R. § 202.4.

The three weekly issues of Life and its Memorial Edition, each containing Zapruder frames, had a total distribution of over 23,750,000 copies. Weekly issues of Life, published outside the United States and containing Zapruder frames, had a circulation of over 3 million copies.

It is undisputed that Life complied with all provisions of the Copyright Act and that, if the Zapruder pictures are properly the subject of copyright, Life secured statutory copyrights for them.

### H. Attempts by Defendants and Thompson to Secure Permission to use the Pictures

Thompson and the other defendants at all relevant times knew that Life had refused permission to use the Zapruder frames in the Book. Until June 22, 1967, there were repeated efforts to secure such permission.

On April 7, Thompson wrote Pollard (copy to Preston) saying that the Zapruder frames were "holes" in his Book and asked to "work out some arrangement" for using them. He emphasized how great was his need for permission and held out a number of inducements for it.

On April 19, Pollard wrote that Life must refuse permission since, if it al-

lowed Thompson to use the frames, it would have to allow such use by the "myriad" magazines, etc. which had been requesting it.

In reply on April 23, Thompson asked Pollard for copies of frames 207–212 (those which had been released on January 30, 1967). He again asked permission to use the other frames, emphasizing his "frustration" because a "quirk of the property laws" was denying him the Zapruder pictures and, that while Life might have a "legal claim", any "moral claim" was "tenuous".

Pollard wrote on April 27 sending Thompson without charge copies of the released frames 207–212 but stating that as to the other frames the "decision cannot be reversed".

On April 27, Preston wrote Pollard, making arguments for permission to use "the frames we have asked to reproduce" and denying any attempt to "profiteer". Preston stated: "No one questions Life's legal rights" but expressed the hope that the management of Life would "give this complex and sensitive matter the fullest consideration". Attached to the Preston letter was a list of the 25 frame numbers for which "permission to reprint" was asked. This list contained the typed signatures of Thompson and of Preston. Sixteen of the frames in the list are among the twenty-two frames which are the subject of the complaint at bar.

On May 4, Pollard wrote Preston that the "Corporation" publishing Life "*cannot* release all the Zapruder frames" (emphasis in original), that there was nothing Pollard could do, and that if Preston wished to pursue the matter he should address himself to the "Publisher's office".

On May 10, Thompson wrote Pollard expressing regret at "the corporate decision not to release the Zapruder film".

On June 6, Hamilton (representing defendants) discussed with Dowd (Editorial Counsel for plaintiff) the permission still being sought for the Zapruder frames. On the following day, Dowd wrote Hamilton that there was a new "management team" at Life and that Dowd would go over again the "policy * * * of not selling frames from the Zapruder film". Dowd asked "precisely what Professor Thompson would like from the film".

On June 9, Hamilton wrote Dowd giving him the numbers of 32 frames for which Thompson wanted "the right to reproduce in his book". 22 of these frames are those which are the subject of the complaint at bar. Hamilton stated that "author and publisher understand that some payment should be made for the right to reproduce these frames in the book".

On June 19, Dowd wrote Hamilton that it "was impossible" to grant permission to use the Zepruder frames, that it was corporation policy "not to allow anyone the use of any part of this film in the United States", that the film was considered "an invaluable asset of the corporation", and that "its use will be limited to our publications and enterprises".

On or about June 22, Associates offered to pay Life a royalty equal to the profits from publication of the Book in return for permission to use specified Zapruder frames in the Book. This offer was refused by Life.

I. Use of the Pictures by Defendants and Thompson Without Permission

Having failed to secure permission from Life to use the Zapruder pictures, Thompson and the other defendants (presumably with the advice of counsel) concluded that they would copy certain frames anyway. Doubtless having in mind the probability of an action for infringement, defendants did not reproduce photographically any Zapruder frames but employed an "artist" to make copies in charcoal by means of a "rendering" or "sketch". It is said that the artist was paid $1550.

Beginning November 18, 1967, Associates has been publishing and Random House, Inc. has been distributing the Book.

The Book relies heavily on the Zapruder pictures.

No Zapruder frame is reproduced in its entirety but whatever parts of any frame were considered significant by Thompson, these were reproduced.

Significant parts of 22 copyrighted frames are reproduced in the Book on the following pages, with figures in parentheses indicating the number of copyrighted frames reproduced on that page:

| Pages | | Pages | | Pages | | Pages | |
|---|---|---|---|---|---|---|---|
| 6 | (3) | 35 | (2) | 70 | (4) | 75 | (10) |
| 7 | (3) | 36 | (1) | 71 | (4) | 79 | (6) |
| 30 | (1) | 68 | (1) | 72 | (2) | 102 | (1) |
| 31 | (3) | 69 | (4) | 73 | (2) | 111 | (1) |
| | | | | | | 276 | (1) |

————◆————

The so-called "sketches" in the Book as listed above are in fact copies, as is readily apparent by comparison with the Zapruder frames involved, copies of all of which have been submitted. The "artist" has simply copied the original in charcoal with no creativity or originality whatever. The point is made clear by defendant Geis himself at the beginning of the Book in a "Note". While attempting to excuse the copying because the Zapruder film, as a "crucial historical document", should not be "sequestered from the eye * * * through an accident of private ownership", Geis emphasizes how accurate the copies are. He says that they have been "checked rigorously against the original sources", that is, the copyrighted pictures, so that "their representation of the events is exact". To illustrate how good the copies are, Geis points to a photographic reproduction of one of the Zapruder frames (No. 207) released by Life for publication in January, 1967. He then asks the reader to compare this original with the Book's "charcoal sketch" and to be assured that "all of the other sketches have been executed with the same care and fidelity".

Some of the Zapruder frames released by Life for publication were used in the Book, as noted above. These appear at pages XVI, 8, 30, and 217. No complaint is made of these uses.

In addition, there are on three pages of the Book (pp. 5, 87, and 130) what are conceded for Life (Hardy affidavit, p. 8) to be "fair sketches" of four copyrighted frames. No complaint is made of those uses.

**J. The Article by Thompson in The Saturday Evening Post**

In its issue dated December 2, 1967, The Saturday Evening Post featured an article by Thompson summarizing the Book and its conclusions. The entire cover was devoted to the article; the cover background was the photograph used on the dust jacket of the Book. The article uses the same material as appears on page 79 of the Book but with significant differences. One of the columns in the Book is headed "Zapruder Frame" and below the heading in sequence appear copies of parts of seven Zapruder frames. In the Post article, the corresponding column is headed "What the Zapruder Frames Show" and below this heading appear in sequence what are described for Life (and what appear to be) "fair sketches" (Hardy affidavit, p. 8) based on the same parts of Zapruder frames copied on page 79 of the Book.

**II**

If there is a genuine issue of material fact whether plaintiff consented to the use made of the Zapruder pictures in the Book, then neither side can be given summary judgment and a trial must be had.

But for all purposes of this motion plaintiff admits the version of defendants, that Billings told Thompson that Thompson could use "Sketches that would be sufficient for [Thompson's] purposes".

Accepting this fact as proven, no defense of consent by plaintiff can be made out.

The reproductions in the Book of parts of Zapruder frames of which complaint is here made are not "sketches"—such as those importantly on page 87 and also on pages 5 and 130 of the Book and in The Saturday Evening Post article—but are in fact copies.

In any event, Billings had no authority whatever to consent for plaintiff corporation to any use of the Zapruder pictures. He was not an officer of the corporation. According to the "masthead" list of the Life magazine organization (see, for example, page 12 of the October 2, 1964 issue) Billings was one of twenty-four associate editors of Life.

The published "masthead" list appears to divide the organization into an editorial side and a business side. The editorial side is given first and Billings is well down in that hierarchy, there being at least twenty organization tiers above the associate editor tier. Pollard, for example, is six tiers above Billings and there appear to be fourteen tiers above Pollard. The business side of the magazine—in which would repose whatever authority the magazine (as opposed to the corporation) might have to deal with copyright property—is separated in the published list from the editorial side. The business personnel, such as publisher, advertising sales director, etc., are given together at the bottom of the "masthead".

Billings did sign the "informal agreement", as Thompson called it (Kern affidavit, Exhibit 1), reducing to writing the terms orally agreed for Thompson's employment by the magazine. He signed his name as an associate editor of Life and did not purport to sign on behalf of the corporation. In the agreement Billings signed, moreover, there was no consent to any use by Thompson of any Zapruder pictures or any "sketches" thereof.

Defendants and Thompson knew that Billings had no authority to consent to use of the Zapruder pictures. When they sought permission to copy the pictures, they did not go to Billings. They wrote to Pollard, Director of Photography for Life. Even as to Pollard, they knew that necessary authority was higher up than he. Pollard advised Thompson on April 27, 1967 that "the *Corporate* decision cannot be reversed" (emphasis supplied). In writing to Pollard on the same day, Preston (of Associates) spoke of "company policy" expressing the hope that the "Life *management* will give this * * * matter the fullest consideration" (emphasis supplied). In answering Preston on May 4, 1967, Pollard advised Preston that the "Corporation" could not release the picture and that if Preston wished to pursue the matter further he should address the "Publisher's office". Thompson knew that Pollard was higher in the hierarchy than Billings and that Pollard had no authority to consent for the corporation. Under date of May 10, 1967, Thompson wrote Pollard regretting "the corporate decision" and expressing the belief that Pollard would consent "if it were in your power". When counsel for defendants approached counsel for Life to secure permission, he was told that counsel for Life would take it up with a "new management team" and would talk with the "Publisher of Life" and Pollard together. At no time did Thompson or defendants indicate that they were relying on any consent by Billings.

In the decision cited for defendants, Curtis Pub. Co. v. Union Leader Corp., 12 F.R.D. 341 (D.N.H.1952), there was a motion for plaintiff for summary judgment. Consent had been pleaded as an affirmative defense. The movant submitted no facts on that issue. The denial of summary judgment is wholly inapplicable here where the facts sub-

mitted for *defendants* do not make out the defense.

There is no genuine issue of material fact as to consent by plaintiff to the use of "sketches" by defendants.

Both sides are agreed that, in this event, the action should be determined by summary judgment for plaintiff or for defendants.

### III

It must be determined if there is a valid copyright in the Zapruder pictures. As noted, all requirements of the Copyright Act have been met. The question remains whether the pictures are properly the subject of copyright.

### A.

It is said for defendants that the pictures are simply records of what took place, without any "elements" personal to Zapruder, and that "news" cannot be the subject of copyright.

The Zapruder pictures are "photographs" of an event. The Copyright Act provides (17 U.S.C. §§ 4, 5(j)) that "Photographs" may be the subject matter of copyright. If this were all to be considered, it would seem clear that the pictures here were properly copyrighted because Congress has expressly made photographs the subject of copyright, without any limitation.

The copyright provision for photographs first appeared in an Act of July 8, 1870 which became Section 4952 of the Revised Statutes and is now Section 5(j) of Title 17 of the Code.

This provision first came before the Supreme Court in Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 4 S.Ct. 279, 28 L.Ed. 349 (1884). The question was whether a studio photograph of Oscar Wilde could be the subject of copyright. It was assumed that Section 4952 applied to *all* photographs. The argument was made, however, that Congress could not constitutionally do so because photographs are not "writings" of which the photographers are "authors", as the quoted words are used in the Constitution (Art. I, § 8, cl. 8).

The argument was that photographs were "merely mechanical" and involved no "novelty, invention or originality" (111 U.S. at 59, 4 S.Ct. at 279). The Supreme Court declined to say whether copyright could constitutionally be granted to "the ordinary production of a photograph" (111 U.S. at 59, 4 S.Ct. at 282). It found that the photograph in suit had involved the posing of the subject and a choice of costume, background, etc. The Court held that the photograph was a writing of which the photographer was the author and that the Congress could constitutionally make such photograph the subject of copyright. This left open whether an ordinary photograph of a real life object could constitutionally be a proper subject of copyright.

The question was again before the Supreme Court in Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 23 S.Ct. 298, 47 L.Ed. 460 (1903). The works were chromolithographs (pictures printed by a special process) of certain groups performing in a circus. The Court, by Mr. Justice Holmes, held that such pictures had been constitutionally made subjects of copyright. The Court found it "obvious" that the result could not be affected by the fact that the pictures represented "actual groups—visible things" and that such pictures "drawn from the life" (as opposed to a "composed" subject) could be copyrighted. In this connection, the Court declared: "Others are free to copy the original. They are not free to copy the copy." (188 U.S. at 249, 23 S.Ct. at 299). And later: "The least pretentious picture has more originality in it than directories and the like, which may be copyrighted" (188 U.S. at 250, 23 S.Ct. at 300).

Judge Learned Hand believed that any photograph could be the subject of copyright because in *Bleistein* the Supreme Court had ruled that "no photograph, however simple, can be unaffected by the personal influence of the author, and no two will be absolutely alike". Jewelers Circular Publishing Co. v. Keystone Pub. Co., 274 Fed. 932, 934 (S.D.

N.Y.1921), affirmed 281 Fed. 83 (2d Cir. 1922). Judge Hand in the same opinion said:

" * * * under section 5(j) photographs are protected, without regard to the degree of 'personality' which enters into them. At least there has been no case since 1909 in which that has been held to be a condition. The suggestion that the Constitution might not include all photographs seems to me overstrained. Therefore, even if the cuts be deemed only photographs, which in these supposed cases they are, still I think that they and the illustrations made from them may be protected."

Mr. Justice Brandeis, in a dissenting opinion, stated: "The mere record of isolated happenings, whether in words or by photographs not involving artistic skill, are denied [copyright] protection". International News Service v. Associated Press, 248 U.S. 215, 254, 39 S.Ct. 68, 78, 63 L.Ed.2d 211 (1918; the "Associated Press" case). The reference to photographs was not necessary to the point being made and in any event it seems clear that Mr. Justice Brandeis was mistaken. None of the cases cited to support his statement had anything to do with photographs, other than *Bleistein* and *Burrow-Giles,* which have already been considered.

The commentators, or at least most of them, have concluded that any photograph may be the subject of copyright.

For example, Nimmer on Copyright, page 99, after explaining that the conclusion of Judge Learned Hand has become "the prevailing view", goes on to say:

" * * * any (or as will be indicated below, almost any) photograph may claim the necessary originality to support a copyright merely by virtue of the photographers' personal choice of subject matter, angle of photograph, lighting and determination of the precise time when the photograph is to be taken. Thus a photograph of the New York Public Library was held to exhibit the necessary originality."

The exceptions indicated by Nimmer's parenthetical "almost any" are not relevant in the case at bar.

A law review article has dealt with this question in part as follows (Gorman, Copyright Protection for the Collection and Representation of Facts, 76 Harv. L.Rev.1569, 1597–1598 (1963):

"There is, no doubt, some element of personality—the choice of subject, the framing of it in the camera viewer, the decision when to shoot—in the taking of a snapshot. * * * its visual appeal, its partaking of the nature of artistic work, seems to have deterred courts from sitting as critics on the degree of artistic merit, skill, or effort embodied in a photograph. Another reason for granting copyright protection to the simple photograph is the familiar saw which tells us that one picture is worth a thousand words. If it can be as instructive as a lengthily written description of the same scene, a photograph advances our knowledge of the useful arts and sciences and enhances our understanding of historical occurrences and natural events, just as much as does the written description. If the latter can be copyrighted because in pursuance of the constitutional purpose, why not photographs too, no matter how studied or how extemporaneous they may be?

" * * * there is little difficulty today in deciding that a photograph has ample originality to be copyrighted. * * * "

There are very few decisions dealing with photographs of real life objects, apparently because their copyright protection has been assumed.

There is an interesting case in this Court some fifty years ago. The question was whether a photograph of a street scene showing the Public Library on Fifth Avenue could be the subject of copyright. The decision upheld the copyright, saying among other things

(Pagano v. Beseler Co., 234 Fed. 963, 964 (2 Cir. 1916):

"It undoubtedly requires originality to determine just when to take the photograph, so as to bring out the proper setting for both animate and inanimate objects, with the adjunctive features of light, shade, position, etc."

Thus, if Zapruder had made his pictures at a point in time before the shooting, he would clearly have been entitled to copyright. On what principle can it be denied because of the tragic event it records?

The defendants argue that "news cannot be copyrighted" citing the *Associated Press* case and National Tel. News Co. v. Western Union, 119 Fed. 294, 60 L.R.A. 805 (7th Cir. 1902).

■ Defendants are perfectly correct in their contention. A news event may not be copyrighted, as the cited cases hold. Life claims no copyright in the news element of the event but only in the particular form of record made by Zapruder.

The *Associated Press* case involved news articles (words) and not photographs. The *Associated Press* case did not involve copyrighted material but the Court discussed news articles as subjects of copyright. The Court carefully distinguished between the "news element", the "substance of the information" on the one hand, and "the particular form or collocation of words in which the writer has communicated it" (248 U.S. at 234, 39 S.Ct. at 70) on the other. The latter, the "particular form", was recognized as a proper subject of copyright, the Court saying (248 U.S. at 234, 39 S.Ct. at 70):

"No doubt news articles ᐧ often posses a literary quality, and are the subject of literary property at the common law; nor do we question that such an article, as a literary production, is the subject of copyright by the terms of the act as it now stands."

## B.

It is said for defendants that the pictures cannot be copyrighted because of "lack of creativity".

This argument has already been dealt with in the discussion just above.

Any photograph reflects "the personal influence of the author, and no two will be absolutely alike", to use the words of Judge Learned Hand.

The Zapruder pictures in fact have many elements of creativity. Among other things, Zapruder selected the kind of camera (movies, not snapshots), the kind of film (color), the kind of lens (telephoto), the area in which the pictures were to be taken, the time they were to be taken, and (after testing several sites) the spot on which the camera would be operated.

## C.

It is said for defendants that aside from all else the Zapruder pictures could not be copyrighted because of the "doctrine" of a recent decision, Morrissey v. Procter & Gamble Co., 379 F.2d 675 (1st Cir. 1967). This "doctrine" is here invoked to avoid an "oligopoly of the facts of the assassination of President Kennedy".

The *Morrissey* case involved the rules of a sales promotion contest. The substance of the contest itself was found not to be copyrightable. It was also found that there was a very limited number of ways in which the rules could be expressed. If the rules were made the subject of copyright, then the uncopyrighted substance of the contest would be appropriated by the owner of the rules copyright. The Court declined to extend copyright protection to the rules.

Such a decision can have no possible application here. Life claims no copyright in the events at Dallas. They can be freely set forth in speech, in books, in pictures, in music, and in every other form of expression. All that Life claims is a copyright in the particular form of expression of the Zapruder film. If this be "oligopoly", it is specifically con-

ferred by the Copyright Act and for any relief address must be to the Congress and not to this Court.

Life has a valid copyright in the Zapruder film.

## IV

■ As already noted, the so-called "sketches" in the Book are in fact copies of the copyrighted film. That they were done in charcoal by an "artist" is of no moment. As put in Nimmer on Copyright, page 98:

"It is of course, fundamental, that copyright in a work protects against unauthorized copying not only in the original medium in which the work was produced, but also in any other medium as well. Thus copyright in a photograph will preclude unauthorized copying by drawing or in any other form, as well as by photographic reproduction."

There is thus an infringement by defendants unless the use of the copyrighted material in the Book is a "fair use" outside the limits of copyright protection.

## V

Whether the use by defendants of the Zapruder pictures is a "fair use" is the most difficult issue in the case. There is no reason to delay decision for a trial, however, because the facts are fully exposed without dispute and both sides agree that summary judgment is proper, each asking for such judgment. In a somewhat similar situation, summary judgment has been found proper. Berlin v. E. C. Publications, Inc., 329 F.2d 541 (2d Cir. 1964).

■ Unlike the owner of a patent (35 U.S.C. § 154), the owner of a copyright is not given by statute (17 U.S.C. § 1) any exclusive right to use the work. The word "use" does not appear in the statute. Whatever the significance of this omission may be, the copyright owner does have the exclusive right to "print, reprint, publish, copy and vend the copyrighted work".

■ Despite such exclusive rights, the courts have nonetheless recognized that copying or other appropriation of a copyrighted work will not entail liability if it is reasonable or "fair". The doctrine is entirely equitable and is so flexible as virtually to defy definition. Our Court of Appeals (L. Hand, A. N. Hand, Patterson, C.JJ.) some years ago described the issue of fair use as "the most troublesome in the whole law of copyright". Dellar v. Samuel Goldwyn, Inc., 104 F.2d 661 (2 Cir. 1939).

The earliest discussion of the principle was in 1841 by Mr. Justice Story at Circuit in Folsom v. Marsh, 9 Fed.Cas. p. 342, No. 4,901. The question arose over the copyright in certain letters of George Washington and was thus stated by Mr. Justice Story (9 Fed.Cas. at 348):

"The question, then, is, whether this is a justifiable use of the original materials, such as the law recognizes as no infringement of the copyright of the plaintiffs."

It was concluded that there was an invasion of the copyright and liability. The test of fair use was primarily the degree of injury to the plaintiff (9 Fed. Cas. at 348, 349):

"If so much is taken, that the value of the original is sensibly diminished, or the labors of the original author are substantially to an injurious extent appropriated by another, that is sufficient, in point of law, to constitute a piracy pro tanto.

\*　\*　\*　\*　\*　\*

"But if the defendants may take three hundred and nineteen letters, included in the plaintiffs' copyright, and exclusively belonging to them, there is no reason why another bookseller may not take other five hundred letters, and a third, one thousand letters, and so on, and thereby the plaintiffs' copyright be totally destroyed."

It would be idle to consider any number of the cases because each was decided on its own facts.

In this Circuit, the most recent case is Rosemont Enterprises, Inc. v. Random

House, Inc., 366 F.2d 303 (2 Cir. 1966). The Court took a somewhat liberal view of the fair use principle. Judge Moore emphasized the factor of "public interest in the free dissemination of information" and found that the "public benefit" to be derived from the challenged work was in no way affected by any motive of defendant for commercial gain.

Since the *Rosemont* decision, the House has on April 11, 1967 passed H.R. 2512, a bill for the general revision of the copyright laws (113 Cong. Rec. 53 (1967)), and the same bill is under consideration by the Senate as S. 597. The bill is the result of years of effort, after many studies for the Register of Copyrights and after many Congressional hearings.

Section 107 of H.R. 2512 and of S. 597 is as follows:

"Limitations on exclusive rights: Fair Use

Notwithstanding the provisions of section 106, the fair use of a copyright work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching, scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use, the factors to be considered shall include:

(1) the purpose and character of the use;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work."

With respect to this provision, the Report of the Committee on the Judiciary of the House said (H.R.Rep.No. 83, 90th Cong., 1st Sess. 29–30 (1967)):

"Although the courts have considered and ruled upon the fair use doctrine over and over again, no real definition of the concept has ever emerged. Indeed, since the doctrine is an equitable rule of reason, no generally applicable definition is possible, and each case raising the question must be decided on its own facts. On the other hand, the courts have evolved a set of criteria which though in no sense definitive or determinative, provide some gage for balancing the equities. These criteria have been stated in various ways, but essentially they can all be reduced to the four standards which were stated in the 1964 bill and have been adopted again in the committee's amendment of section 107: '(1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work'."

The Committee noted that any precise definition of fair use was impossible and said (at 32) that

"* * * the endless variety of situations and combinations of circumstances that can arise in particular cases precludes the formulation of exact rules in the statute. We endorse the purpose and general scope of the judicial doctrine of fair use, as outlined earlier in this report, but there is no disposition to freeze the doctrine in the statute, especially during a period of rapid technological change. Beyond a very broad statutory explanation of what fair use is and some of the criteria applicable to it, the courts must be free to adapt the doctrine to particular situations on a case-by-case basis.

"Section 107, as revised by the committee, is intended to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way."

The difficult job is to apply the relevant criteria.

■ There is an initial reluctance to find any fair use by defendants because of the conduct of Thompson in making his copies and because of the deliberate appropriation in the Book, in defiance of the copyright owner. Fair use presupposes "good faith and fair dealing". Schulman, Fair Use and the Revision of the Copyright Act, 53 Iowa L.Rev. 832 (1968). On the other hand it was not the nighttime activities of Thompson which enabled defendants to reproduce copies of Zapruder frames in the Book. They could have secured such frames from the National Archives, or they could have used the reproductions in the Warren Report or in the issues of Life itself. Moreover, while hope by a defendant for commercial gain is not a significant factor in this Circuit, there is a strong point for defendants in their offer to surrender to Life all profits of Associates from the Book as royalty payment for a license to use the copyrighted Zapruder frames. It is also a fair inference from the facts that defendants acted with the advice of counsel.

■ In determining the issue of fair use, the balance seems to be in favor of defendants.

There is a public interest in having the fullest information available on the murder of President Kennedy. Thompson did serious work on the subject and has a theory entitled to public consideration. While doubtless the theory could be explained with sketches of the type used at page 87 of the Book and in The Saturday Evening Post, the explanation actually made in the Book with copies is easier to understand. The Book is not bought because it contained the Zapruder pictures; the Book is bought because of the theory of Thompson and its explanation, supported by Zapruder pictures.

There seems little, if any, injury to plaintiff, the copyright owner. There is no competition between plaintiff and defendants. Plaintiff does not sell the Zapruder pictures as such and no market for the copyrighted work appears to be affected. Defendants do not publish a magazine. There are projects for use by plaintiff of the film in the future as a motion picture or in books, but the effect of the use of certain frames in the Book on such projects is speculative. It seems more reasonable to speculate that the Book would, if anything, enhance the value of the copyrighted work; it is difficult to see any decrease in its value.

VI

■ Plaintiff has no cause of action under the State law for unfair competition.

The parties are not in competition and it has been found that the copying by defendants was fair and reasonable.

■ If the copying of a copyrighted work is not actionable under the Copyright Act, it is doubtful that it is unfair competition under the law of New York. Estate of Hemingway v. Random House, Inc., 53 Misc.2d 462, 279 N.Y.S.2d 51 (Sup.Ct.), aff'd without opinion 29 A.D. 2d 633, 285 N.Y.S.2d 568 (1st Dept. 1967), motion for leave to appeal granted 29 A.D.2d 739 (1st Dept. 1968).

■ In any event, it seems clear that if there is no action for statutory copyright infringement because the copying by defendants is found a fair use, then New York could not constitutionally make such copying an act of unfair competition. Sears Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed. 2d 661 (1964); Compco Corp. v. Day-Brite Lighting, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964).

The motion of plaintiff is denied.

The Clerk is directed to enter judgment in favor of defendants.

So ordered.